**MERCHANTS DESPATCH TRANSPOR-
TATION CORPORATION,
Plaintiff-Appellant,**

v.

**SYSTEMS FEDERATION NUMBER ONE
RAILWAY EMPLOYEES' DEPART-
MENT AFL-CIO CARMEN, etc., et al.,
Defendants-Appellees.**

**No. 76–1766.**

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 10, 1977.

Decided March 9, 1977.

Peter V. Fazio, James E. Spiotto, Mark Cohen, Chicago, Ill., for plaintiff-appellant.

Edward J. Hickey, Jr., Michael S. Wolly, Washington, D. C., Samuel K. Skinner, U. S. Atty., James T. Hynes, Asst. U. S. Atty., Chicago, Ill., for defendants-appellees.

Before SWYGERT, SPRECHER, Circuit Judges and EAST, Senior District Judge.[*]

SWYGERT, Circuit Judge.

The issue in this case is whether the federal courts may review decisions by special boards of adjustment established to arbitrate disputes under section 3 Second, first paragraph, of the Railway Labor Act, 45 U.S.C. § 153 Second, first paragraph. We hold that these arbitration decisions are reviewable, and reverse the judgment of the district court.

I

Appellant Merchants Despatch Transportation Corporation ("MDT") leases locomotives, rail cars, flat cars, auto rack equipment and refrigerator cars. It also provides protective service for perishable goods in refrigerator cars. Until April 1, 1976, MDT was a wholly-owned subsidiary of the Penn Central Transportation Company. On that date, it was acquired by the Consolidated Rail Corporation ("Conrail") in connection with the Revised Final System Plan submitted by the United States Railway Association pursuant to section 201(a) of the Regional Rail Reorganization Act of 1973, 45 U.S.C. § 711(a). Conrail is a Delaware corporation established under section 301(a) of the Regional Rail Reorganization Act, 45 U.S.C. § 741(a). Although MDT is not a common carrier by rail, it is and has been during all relevant periods a "carrier" within the meaning of section 1 First of the Railway Labor Act, 45 U.S.C. § 151 First, because Penn Central was, and Conrail is, a common carrier by rail.

Appellee Systems Federation Number One Railway Employees' Department AFL–CIO Carmen ("the Union") is a designated representative under the Railway Labor Act of employees of MDT. In March 1965, MDT and the Union became participants in an already existing labor agreement. Article VI of that agreement provided for the establishment of Shop Craft Special Board of Adjustment No. 570, pursuant to section 3 Second, first paragraph, of the Railway Labor Act, to arbitrate disputes arising under article I, dealing with employees protection, and article II, dealing with subcontracting. The Board consisted of two members appointed by the carriers who were parties to the agreement and two members appointed by the signatory unions. Ties were to be broken by a referee selected by the National Mediation Board established under section 4 of the Railway Labor Act, 45 U.S.C. § 154. Article VI provided that: "Decisions of the Board shall be final and binding upon the parties to the dispute."

On November 14, 1972, MDT announced that because of a decline in business it would reduce the work force in its New

* Senior District Judge William G. East of the District of Oregon is sitting by designation.

Orleans shop and furlough eight employees. MDT further announced on May 22, 1973 that it was closing the New Orleans shop and that the rest of the employees there would be furloughed.

The Union contended that the furloughed employees were entitled to protective benefits under article I, section 2(b) of the labor agreement, which provided that:

> [P]rotective benefits . . . shall be applicable . . . with respect to employees who are deprived of employment . . . as a result of the following changes in the operations of this individual carrier:
>
>     *    *    *    *    *    *
>
> (b) Abandonment, discontinuance for 6 months or more, or consolidation of facilities or services or portions thereof;

The Union further asserted that MDT violated article I, section 4 of the agreement by failing to give "at least sixty (60) days . . . written notice of the abolition of jobs as a result of the changes in operations for any of the reasons set forth in section 2 hereof. . . ." Accordingly, it sought back pay for the difference in time between the amount of notice actually given and sixty days.

MDT replied that it was not required to pay protective benefits nor give sixty days notice to the furloughed employees because it had not abandoned its New Orleans facility; rather, it asserted, it had reduced its work force because of a decline in business. MDT relied for support on article I, section 3 of the agreement, which stated:

> An employee shall not be regarded as deprived of employment or placed in a worse position with respect to his compensation and rules governing working conditions in case of his resignation, . . . or reductions in forces due to seasonal requirements, the lay off of temporary employees or a decline in a carrier's business, or for any other reason not covered by Section 2 hereof.

MDT also contended that the Union's complaints were time-barred under a Work Rule agreement which required any employee claiming unjust treatment to take the matter up with his foreman within seven days.

MDT and the Union were unable to resolve their differences and submitted the dispute to the Special Board of Adjustment on February 20, 1974. The Board was initially deadlocked, and a referee was selected pursuant to the established tiebreaking procedure. On June 30, 1975, the Board ruled in the Union's favor, holding that the complaints were not time-barred and that the furloughed employees were entitled to protective benefits and back pay for each day that the sixty day notice was late in being posted.

On September 5, 1975, MDT filed suit in the district court for the Northern District of Illinois, seeking review of the Special Board's award. The court dismissed the action, holding that under our decision in *Brotherhood of Railway, Airline and Steamship Clerks v. Special Board of Adjustment No. 605*, 410 F.2d 520 (7th Cir.), *cert. denied*, 396 U.S. 887, 90 S.Ct. 177, 24 L.Ed.2d 162 (1969), the federal courts lack jurisdiction to review arbitration awards by special boards of adjustment. MDT now appeals from that decision.

## II

In analyzing the issue in this case, it is helpful to review the structure of the Railway Labor Act with respect to the arbitration of disputes as it developed over time.[1] In Title III of the Transportation Act of 1920, 41 Stat. 456, Congress imposed a duty on the railroads and their employees to negotiate when labor disputes arose. The Act permitted the parties, at their election, to create boards of labor adjustment to arbitrate unresolvable disputes. If a board was never created, or could not reach a

---

1. The Supreme Court has extensively reviewed the legislative history of the Railway Labor Act. *See, e. g., International Ass'n of Machinists, AFL–CIO v. Central Airlines, Inc.*, 372 U.S. 682, 83 S.Ct. 956, 10 L.Ed.2d 67 (1963); *Union Pac. R.R. v. Price*, 360 U.S. 601, 79 S.Ct. 1351, 3 L.Ed.2d 1460 (1959).

decision, the matter at issue was to be referred to the Railway Labor Board. The decisions of the boards of labor adjustment and the Railway Labor Board, however, were not legally enforceable.

Neither the railroads nor the employees voluntarily complied with the decisions of the boards of labor adjustment or the Railway Labor Board, and Congress responded in 1926 by enacting the basic framework of the present Railway Labor Act. Section 3 First of the 1926 Act provided that "Boards of adjustment shall be created by agreement" of the parties to arbitrate minor disputes. The boards were to be composed of an equal number of employee and employer representatives. The decisions of the adjustment boards were "final and binding on both parties," and it was "the duty of both to abide by such decisions". If a minor dispute could not be resolved by an adjustment board, then it went to the Board of Mediation, which ordinarily handled major disputes.

In spite of the mandatory language used in the 1926 Act, the railroads and their employees frequently did not agree to establish adjustment boards. Moreover, the boards that were created were often deadlocked. Therefore, Congress amended the Act in 1934 to create the present National Railway Adjustment Board ("NRAB") to arbitrate minor disputes. Parties could now force disputes to be referred to the NRAB for a final and binding decision. Under section 3 First (p), employees could enforce favorable awards from the NRAB in the district courts.

Although the 1934 amendments created the NRAB, sometimes referred to as the "statutory" board, they did not do away with the private adjustment boards created by the 1926 Act. Section 3 Second of the 1934 amendments provided that:

Nothing in this section shall be construed to prevent any individual carrier, system or group of carriers and any class or classes of its or their employees, all acting through their representatives, selected in accordance with the provisions of this Act, from mutually agreeing to the establishment of system, group, or regional boards of adjustment for the purposes of adjusting and deciding disputes of the character specified in this section. In the event that either party to such a system, group, or regional board of adjustment is dissatisfied with such arrangement, it may upon ninety days' notice to the other party elect to come under the jurisdiction of the Adjustment Board.

Thus, the parties were still permitted to settle their disputes through private arbitration rather than by going to the NRAB.

The Act was amended for the final time in 1966. Following the adoption of the 1934 amendments, the parties made little use of the voluntary adjustment boards. Consequently the NRAB fell far behind in its work, and employees who had grievances sometimes had to wait as long as ten years before a decision was rendered on their claims. Congress therefore added a second paragraph to section 3 Second providing that either party can require the establishment of a special board of adjustment. These boards are commonly referred to as "public law boards," while the adjustment boards of section 3 Second, first paragraph, are called "special boards of adjustments." [2]

The public law boards are to consist of one person designated by the carrier and one person designated by the employees. If either party fails to provide a representative, or if the board is deadlocked, the impasse is to be broken by the National Mediation Board. The decisions of public law boards are "final and binding upon both parties" and awards are enforceable in the district courts. This court has construed section 3 Second, second paragraph, to permit judicial review at the behest of either party aggrieved by an award of a public

---

**2.** *See* Thirty-Eighth Annual Report of the National Mediation Board 45–46 (1972); 29 C.F.R. § 1207. This terminology is strange because the second paragraph of section 3 Second contains the phrase "special board of adjustment" while the first paragraph does not. It is the terminology used by the parties, however, and we will follow it.

law board. *United Transportation Union v. Indiana Harbor Belt R.R.,* 540 F.2d 861 (7th Cir. 1976).

Congress also amended the Act in 1966 to broaden the scope of judicial review of NRAB decisions. Section 3 First (q) was added, permitting either party aggrieved by an award of the NRAB to seek review in the district courts. Section 3 First (p) of the 1934 amendments had been construed only to permit enforcement by the district courts of awards favorable to employees.

In summary, the Railway Labor Act now provides for three kinds of arbitration of disputes. The Act explicitly vests jurisdiction in the federal courts to review arbitration decisions by the NRAB and by public law boards. In this case, however, the parties utilized a special board of adjustment—the third type of arbitration which the Act authorizes—and the Act is silent as to judicial review of special board of adjustment decisions.

### III

In *Railway Clerks,* we held that arbitration awards by special boards of adjustment were not reviewable in the federal courts. The basis for our decision was: 1) section 3 First (q) of the Act, 45 U.S.C. § 153 First (q), which gives the federal courts jurisdiction to review arbitration awards by the NRAB, is inapplicable to special boards of adjustment; 2) no jurisdiction could be established under 28 U.S.C. §§ 1331 or 1337. 410 F.2d at 522–23.

MDT now asks us to overrule *Railway Clerks* and reverse the judgment of the district court. It contends that the district court had jurisdiction to review the award of Special Board No. 570 both directly under the Railway Labor Act and under its power conferred by 28 U.S.C. § 1331 to decide cases arising under the laws of the United States. We shall consider each argument separately.

### A.

Unlike the appellant in *Railway Clerks,* MDT does not contend that section 3 First (q), which gives the federal courts jurisdiction to review NRAB awards, also applies to special boards of adjustment. Instead, it broadly asserts that the legislative history of the 1934 amendments demonstrates that Congress intended arbitration decisions made by boards established by agreement of the parties under the newly created section 3 Second to be subject to review in the district courts.

The lynchpin of MDT's argument is that because under the 1934 amendments the decisions of private boards of adjustment were to remain binding and legally enforceable, jurisdiction to review those decisions in the federal courts is necessarily implied to avoid a situation, contrary to congressional intent, where the losing party would refuse to be bound by the board's award. This argument has two flaws. First, while we agree that Congress in 1934 intended private board of adjustment awards to remain legally binding, that goal could be achieved by only permitting the winning party to use the enforcement mechanism of the courts. This would exclude MDT from seeking review in this case. Second, legal enforceability of special board awards could be achieved by resorting to the state courts. Federal courts are courts of limited jurisdiction, and we cannot assume that a statute creates federal jurisdiction in the absence of explicit supporting evidence.

This evidence is missing from the legislative history of the 1934 amendments. MDT relies heavily on testimony before the Senate Interstate Commerce Committee by George Harrison, who was President of the Brotherhood of Railway Clerks.[3] However, the exchange between Harrison and the Chairman of the Committee demonstrates only that there was no clear congressional

3. The testimony on which MDT relies is:

The Chairman: Now, what is the difference between national board and local board of adjustment?

Mr. Harrison: Local boards of adjustment are the same kind of boards as the national board, designed to handle the controversies on that one particular railroad. The national

intent to establish judicial review of special board of adjustment awards in the federal courts. In response to the Chairman's question of whether those awards would be "enforceable in the courts just the same as the national-board decisions," Harrison stated that although there was no specific provision for judicial review in the 1934 amendments, jurisdiction already existed under the 1926 law. The Chairman demurred, stating that specific authority was necessary. Thus, this testimony undercuts as much as it supports a finding of congressional intent to establish jurisdiction.

MDT also argues that unless the legislative history of the Act is interpreted to confer jurisdiction on the federal courts to review decisions of special boards of adjustment, the result would be a legislative "hodgepodge" which Congress could not have intended. We disagree. There is nothing inherently irrational about a statutory scheme in which the federal courts are given jurisdiction to review the awards of the NRAB and public law boards but not those of special boards of adjustment. Whether or not it is the best way to structure the Railway Labor Act is beside the point, for we may not rewrite statutes on the ground that they are unwise. We cannot find jurisdiction under the Act unless Congress put it there. Nothing in the legislative history convinces us that it did so.

The strongest argument that the Railway Labor Act confers jurisdiction on the federal courts to review special board of adjustment awards is contained in the Act itself rather than its legislative history. This theory, adopted by the court in *Kansas City Southern Ry. v. Brotherhood of Railroad Trainmen,* 305 F.Supp. 1142, 1147–49 (W.D. Mo.1969), is that section 3 Second, second paragraph, which explicitly grants jurisdiction to the federal courts to review public law board awards, also created jurisdiction to review awards by boards established under section 3 Second, first paragraph.[4] It is supported by the language of section 3 Second, second paragraph, which makes no explicit distinction between the mandatory

---

board will handle all the controversies developing in the country.

The Chairman: Would the action of the local board be appealed to the national board?

Mr. Harrison: No; we don't so comprehend in our suggestions.

The Chairman: Do you have regional boards also?

Mr. Harrison: No, sir. The situation is this, Senator: The bill provides in the first instance for the setting up of a national board. Now, we say to the parties: "You don't need to use this national board if you can't [sic; can] agree with your men back home to set up a board in lieu of that national board."

The Chairman: That is a system board?

Mr. Harrison: A system board, or a regional board, or a group board. "If you do set it up, then you are exempt from the national board."

The Chairman: Are the decisions enforceable in the courts just the same as the national-board decisions?

Mr. Harrison: We don't provide for that, but it is our intention and our purpose that such system boards, group boards, or regional boards that are established by the parties, by agreement, will provide such terms that the decisions can be enforced in the courts. The fact of the matter is the present law provides for that. It provides that decisions

shall be final and binding and conclusive on the parties, and I think that kind of decisions can be enforced.

Mr. Chairman: Not unless there is specific authority, I think.

Mr. Harrison: Well, we might very well provide that, if the committee don't think it is covered.

Hearings on S. 3266 before the Senate Committee on Interstate Commerce, 73d Cong., 2d Sess. at 34 (1934).

4. Section 3 Second, 45 U.S.C. § 153 Second, provides:

Second. Nothing in this section shall be construed to prevent any individual carrier, system, or group of carriers and any class or classes of its or their employees, all acting through their representatives, selected in accordance with the provisions of this chapter, from mutually agreeing to the establishment of system, group, or regional boards of adjustment for the purpose of adjusting and deciding disputes of the character specified in this section. In the event that either party to such a system, group, or regional board of adjustment is dissatisfied with such arrangement, it may upon ninety days' notice to the other party elect to come under the jurisdiction of the Adjustment Board.

If written request is made upon any individual carrier by the representative of any craft or class of employees of such carrier for

"boards" which it authorizes and the purely voluntary "boards" of section 3 Second, first paragraph. If the two paragraphs are read together, it is not implausible that the provision for judicial review contained at the end of the second paragraph was intended to cover boards established under the first paragraph as well.

Whether Congress in fact intended such a result, however, is, as MDT admits, unclear. *See* S.Rep. No. 1201, 1966 U.S.Code Cong. & Admin.News, p. 2285. Moreover, there are strong reasons to doubt this conclusion. It depends on a finding that public law boards and voluntary special boards of adjustment are essentially the same entities; "that the only real difference between the two boards is the time and manner of their creation."

*Kansas City Southern Ry.,* 305 F.Supp. at 1149. But that is not the only difference between the two kinds of boards. A public law board must consist of two members, with impasses to be resolved by a temporary third member chosen by the National Mediation Board. A special board of adjustment can have as many members as the parties choose, and the parties can select any tiebreaking mechanism they desire. Second, if the parties are dissatisfied with a special board of adjustment, they can dissolve it on ninety days notice and come under the jurisdiction of the NRAB. To permit the parties to dissolve a public law board and go to the NRAB would defeat the primary purpose for the enactment of section 3 Second, second paragraph.

the establishment of a special board of adjustment to resolve disputes otherwise referable to the Adjustment Board, or any dispute which has been pending before the Adjustment Board for twelve months from the date the dispute (claim) is received by the Board, or if any carrier makes such a request upon any such representative, the carrier or the representative upon whom such request is made shall join in an agreement establishing such a board within thirty days from the date such request is made. The cases which may be considered by such board shall be defined in the agreement establishing it. Such board shall consist of one person designated by the carrier and one person designated by the representative of the employees. If such carrier or such representative fails to agree upon the establishment of such a board as provided herein, or to exercise its rights to designate a member of the board, the carrier or representative making the request for the establishment of the special board may request the Mediation Board to designate a member of the special board on behalf of the carrier or representative upon whom such request was made. Upon receipt of a request for such designation the Mediation Board shall promptly make such designation and shall select an individual associated in interest with the carrier or representative he is to represent, who, with the member appointed by the carrier or representative requesting the establishment of the special board, shall constitute the board. Each member of the board shall be compensated by the party he is to represent. The members of the board so designated shall determine all matters not previously agreed upon by the carrier and the representative of the employees with respect to the establishment and jurisdiction of the

board. If they are unable to agree such matters shall be determined by a neutral member of the board selected or appointed and compensated in the same manner as is hereinafter provided with respect to situations where the members of the board are unable to agree upon an award. Such neutral member shall cease to be a member of the board when he has determined such matters. If with respect to any dispute or group of disputes the members of the board designated by the carrier and the representative are unable to agree upon an award disposing of the dispute or group of disputes they shall by mutual agreement select a neutral person to be a member of the board for the consideration and disposition of such dispute or group of disputes. In the event the members of the board designated by the parties are unable, within ten days after their failure to agree upon an award, to agree upon the selection of such neutral person, either member of the board may request the Mediation Board to appoint such neutral person and upon receipt of such request the Mediation Board shall promptly make such appointment. The neutral person so selected or appointed shall be compensated and reimbursed for expenses by the Mediation Board. Any two members of the board shall be competent to render an award. Such awards shall be final and binding upon both parties to the dispute and if in favor of the petitioner, shall direct the other party to comply therewith on or before the day named. Compliance with such awards shall be enforceable by proceedings in the United States district courts in the same manner and subject to the same provisions that apply to proceedings for enforcement of compliance with awards of the Adjustment Board.

We do not regard these distinctions as insignificant. If Congress in 1966 had intended that public law boards were to be identical to the special boards of adjustment created under the 1926 Act and retained under the 1934 amendments, it would have repealed section 3 Second, first paragraph, instead of retaining it. Since the boards referred to in the two paragraphs of section 3 Second are different, we hold that the provision for judicial review contained in the second paragraph does not apply to voluntary boards established under the first paragraph.

**B.**

In *Railway Clerks,* appellant contended that the federal courts had jurisdiction under 28 U.S.C. §§ 1331[5] and 1337[6] to review awards of special boards of adjustment because, under the Supreme Court's decision in *International Ass'n of Machinists v. Central Airlines, Inc.,* 372 U.S. 682, 83 S.Ct. 956, 10 L.Ed.2d 67 (1963), those awards "arise under" the Railway Labor Act. We rejected this argument, holding that *Machinists* was distinguishable. We now hold that the distinction we drew, while correct, does not vitiate the applicability of *Machinists* to awards made by special boards of adjustment. Consequently, *Railway Clerks* is overruled.[7]

The Supreme Court in *Machinists* held that the federal courts had jurisdiction under sections 1331 and 1337 to review awards of system boards of adjustment established under section 204 of the Railway Labor Act to arbitrate disputes in the airline industry. The Court based its decision on two factors. First, section 204 imposed a mandatory duty on the airlines to establish system boards. The breach of that duty, like the

breach of the duty to bargain under the National Labor Relations Act, was enforceable in the federal courts. Federal jurisdiction was necessary because "[i]t is . . . the statute and the federal law which must determine whether the contractual arrangements made by the parties are sufficient to discharge the mandate of § 204 and are consistent with the Act and its purposes." 372 U.S. at 691, 83 S.Ct. at 961.

But the Court went on to hold that "arising under" jurisdiction existed because the labor agreements at issue and their interpretation were governed by Railway Labor Act:

The contracts and the adjustment boards for which they provide are creations of federal law and bound to the statute and its policy. If any provision contained in a § 204 contract is enforceable, it is because of congressional sanction: "[T]he federal statute is the source of the power and authority . . . . The enactment of the federal statute . . . is the governmental action . . . though it takes a private agreement to invoke the federal sanction. . . . A union agreement made pursuant to the Railway Labor Act has, therefore, the imprimatur of the federal law upon it . . . ." *Railway Dept. v. Hanson,* 351 U.S. 225, 232, 76 S.Ct. 714, 718, 100 L.Ed. 1112. That is, the § 204 contract, like the Labor Management Relations Act § 301 contract, is a federal contract and is therefore governed and enforceable by federal law, in the federal courts. 372 U.S. at 692, 83 S.Ct. at 962.

We held in *Railway Clerks* that *Machinists* was distinguishable because special boards of adjustment are established by voluntary contractual action of the parties

---

**5.** 28 U.S.C. § 1331 provides, in pertinent part:
"(a) The district courts shall have original jurisdiction of all civil actions wherein the matter in controversy exceeds the sum or value of $10,000, exclusive of interest and costs, and arises under the Constitution, laws, or treaties of the United States."

**6.** 28 U.S.C. § 1337 provides:
"The district courts shall have original jurisdiction of any civil action or proceeding aris-

ing under any Act of Congress regulating commerce or protecting trade and commerce against restraints and monopolies."

**7.** This opinion has been circulated among all judges of this court in regular active service in view of the overruling of the circuit's decision in *Railway Clerks.* A majority of the judges voted not to rehear the matter *en banc.*

while airline carriers are required by section 204 to establish system boards of adjustment. 410 F.2d at 523. This distinction renders inapposite the first ground of decision in *Machinists:* the need to use federal law to determine whether the duty to reach an agreement imposed by section 204 had been met. Since section 3 Second, first paragraph, does not require the parties to establish a special board of adjustment, there is no duty to reach an agreement that needs to be enforced in the federal courts.

However, the second ground of *Machinists* is equally applicable to this case. The labor agreement to which MDT and the Union are parties is governed by the Railway Labor Act. Special Board No. 570, which under the 1926 Act and 1934 amendments can make awards that are legally enforceable, is a creation of the Act and obtains its authority from federal law. These are federal contracts, and their interpretation must be ultimately reviewed in the federal courts.

To hold otherwise would be to remand this class of cases to the state courts, because the contracts and their interpretation by the special boards are legally binding. This could lead to considerable confusion in an area in which "[t]he needs of the subject matter manifestly call for uniformity." *Machinists,* 372 U.S. at 691–92, 83 S.Ct. at 962. The facts of this case demonstrate the problems that would be created if state court jurisdiction is permitted. If a Louisiana state court upheld Special Board No. 570's finding that the employees are entitled to protective benefits, but the court of another state found for MDT in a similar claim arising out of the closing of an MDT shop in that state, then different sets of MDT employees would receive different treatment under the same labor agreement simply because they lived in different states. Moreover, if a federal court interpreted similar substantive provisions in a labor agreement which called for disputes to be arbitrated by the NRAB or a public law board and reached a different conclusion than a state court reviewing a special board award, different employees would re-

ceive different benefits simply because of the arbitration procedure chosen. Either result would be contrary to the federal policy embodied in the Railway Labor Act of establishing a single national law to govern labor relations between the railroads and their employees.

 Accordingly, we hold that the federal courts have jurisdiction under sections 1331 and 1337 to review awards of special boards of adjustment. Our decision is in accord with the Fourth Circuit's analysis of this problem. *See Employees Protective Ass'n. v. Norfolk & Western Ry.,* 511 F.2d 1040 (4th Cir. 1975).

The judgment of the district court is reversed and the cause is remanded for further proceedings consistent with this opinion.