LOCAL DIVISION 519, AMALGAMATED
TRANSIT UNION, AFL–CIO,
Plaintiff-Appellee,

v.

LACROSSE MUNICIPAL TRANSIT
UTILITY and City of LaCrosse, Wisconsin, Defendants-Appellants.

No. 77–1981.

United States Court of Appeals,
Seventh Circuit.

Argued April 24, 1978.

Decided Oct. 19, 1978.

Joseph S. Kaufman, Baltimore, Md., for
defendants-appellants.

Linda R. Hirshman, Chicago, Ill., for plaintiff-appellee.

Before SWYGERT and CUMMINGS, Circuit Judges, and MARKEY, Chief Judge.[1]

SWYGERT, Circuit Judge.

Defendants-appellants appeal from an order granting a preliminary injunction enforcing a binding arbitration clause in a collective bargaining agreement made pursuant to the provisions of 49 U.S.C. §§ 1601 et seq. The questions on appeal are: (1) whether the district court had jurisdiction over this action; (2) whether, if federal jurisdiction exists, the district court should have abstained from exercising it; and (3) whether the district court improvidently issued the preliminary injunction.

From the turn of the century until 1974 intracity transit facilities in the City of LaCrosse, Wisconsin were furnished by the LaCrosse Transit Company, a private enterprise. During the spring of 1974 the City created the Municipal Transit Utility and applied for a capital grant from the Urban Mass Transportation Administration under the Urban Mass Transportation Act of 1964, 49 U.S.C. §§ 1601 et seq. The application was principally for the purpose of obtaining funds to purchase the Transit Company.

Following the grant of the funds, the purchase was effected and the municipally owned bus system began operations January 1, 1975.

The Transit Company's employees have always been represented by Local Division 519, Amalgamated Transit Union, AFL-CIO, for purposes of collective bargaining, and during the period 1936–1975 they were entitled to the protection of the National Labor Relations Act, 29 U.S.C. §§ 151 et seq. As a result of the acquisition of the Transit Company by the Municipal Transit Utility, the employees became public employees and were no longer covered by the National Labor Relations Act. Local 519, however, continued to be their collective bargaining agent. Before the takeover, the Transit Company and the Union were parties to a collective bargaining agreement governing the wages, terms, and working conditions of the employees. The agreement covered the period from March 1973 to June 1975 and established binding arbitration for all differences relating to the terms of employment.[2]

The application for a federal grant was accompanied by an agreement between LaCrosse and the Union executed on April 4, 1974 and was made pursuant to the requirements of § 13(c) of the Urban Mass Trans-

---

1. The Honorable Howard T. Markey, Chief Judge, United States Court of Customs and Patent Appeals, sitting by designation.

2. Section I—Method of Negotiation

\* \* \* \* \* \*

The Company agrees to meet with duly accredited officers and committees of the Union upon all matters relative to wages, hours and working conditions, dealing first through the Superintendent or Operations Manager; then, in case of failure to reach agreement, the matter in dispute shall be taken up with the President of the Company or his accredited representative. In case no agreement is reached by the representative of the Company and the Union, the matter in dispute shall be submitted, at the request of either party, to a Board of Arbitration selected in the manner hereinafter specified, and the Company and the Union agree that the decision of such Board shall be final and binding on both parties.

Section II—Method of Arbitration

All differences relating to wages, hours or working conditions of men covered by this agreement which cannot be agreed upon by

collective bargaining are to be submitted for decision to an Arbitration Board consisting of Three persons, one chosen by the Company, one chosen by the Union, and two thus selected shall meet daily and select the third. In case of failure to agree on the third person after Ten days, such party shall be selected through a process of elimination, alternately, between the Company and the Union, from a list submitted by the Wisconsin Labor Relations Board. The Board so constituted shall meet within Three days and the decision rendered by this Board shall be binding upon both parties.

Either party desiring to arbitrate any case must notify the other party in writing, and the failure of either party to appoint its own Arbitrator within Ten working days after receipt of same shall forfeit its case.

Each party shall bear the expense of its own Arbitrator, and the expense of the third Arbitrator shall be borne equally by the parties hereto.

portation Act, 49 U.S.C. § 1609(c).[3] Under that section, a grant applicant is obliged to make "fair and equitable arrangements . . . to protect the interests of employees affected by such assistance" as a condition of the receipt of federal funds. Accordingly, the agreement recognized the Union as the collective bargaining representative of the employees of the Transit Utility. It also guaranteed that the Transit Utility would bargain collectively with Local 519 and would arbitrate labor disputes, including the making or maintaining of collective bargaining agreements.[4] (The 13(c) agreement did not, however, provide a procedure for enforcing these rights.) The agreement was approved by the Secretary of Labor on May 1, 1974 and was incorporated into the capital grant contract between LaCrosse and the United States, which was concluded in November 1974.[5]

3. Section 13(c) provides:

It shall be a condition of any assistance under section 1602 of this title that fair and equitable arrangements are made, as determined by the Secretary of Labor, to protect the interests of employees affected by such assistance. Such protective arrangements shall include without being limited to, such provisions as may be necessary for (1) the preservation of rights, privileges, and benefits (including continuation of pension rights and benefits) under existing collective bargaining agreements or otherwise; (2) the continuation of collective bargaining rights; (3) the protection of individual employees against a worsening of their positions with respect to their employment; (4) assurances of employment to employees of acquired mass transportation systems and priority of reemployment of employees terminated or laid off; and (5) paid training or retraining programs. Such arrangements shall include provisions protecting individual employees against a worsening of their positions with respect to their employment which shall in no event provide benefits less than those established pursuant to section 5(a)(f) of this title. The contract for the granting of any such assistance shall specify the terms and conditions of the protective arrangements.

4. The 13(c) agreement provides in part:

(2) All rights, privileges, and benefits (including pension rights and benefits) of employees covered by this agreement (including employees having already retired) under existing collective bargaining agreements or otherwise; or under any revision or renewal thereof, shall be preserved and continued; provided, however, that such rights, privileges and benefits not previously vested may be modified by collective bargaining and agreement by the operator of the transit system and the Union to substitute rights, privileges and benefits of equal or greater economic value.

(3) The collective bargaining rights of employees represented by the Union, including the right to arbitrate labor disputes and to maintain union security and checkoff arrangements, as provided by applicable laws, policies and/or existing collective bargaining agreements shall be preserved and continued.

The Public Body agrees that it will bargain collectively with the Union or otherwise arrange for the continuation of collective bargaining, and that it will enter into agreements with the Union or arrange for such agreements to be entered into, relative to all subjects which are or may be proper subjects of collective bargaining with a private employer.

\* \* \* \* \* \*

(11) In the event of any labor dispute involving the Public Body and the employees covered by this agreement which cannot be settled within thirty (30) days after such dispute first arises, such dispute may be submitted at the written request of either the Union or the Public Body to a board of arbitration selected in accordance with the existing collective bargaining agreement, if any, or if none, as hereinafter provided. . . . The term "labor dispute" shall be broadly construed and shall include, but not be limited to, any controversy concerning wages, salaries, hours, working conditions or benefits, including health and welfare, sick leave, insurance or pension and retirement provisions, the making or maintaining of collective bargaining agreements, the terms to be included in such agreements and the interpretation and application of such collective bargaining agreements.

\* \* \* \* \* \*

(17) If this Project is approved for assistance under the Act, the foregoing terms and conditions shall be made part of the contract of assistance between the Federal Government, and the applicant for federal funds, provided, however, that this agreement shall not merge into the contract of assistance, but shall be independently binding and enforceable by and upon the parties hereto, in accordance with its terms; nor shall the collective bargaining agreement between the Union and the operator of the transit system merge into this agreement, but each shall be independently binding and enforceable by and upon the parties thereto, in accordance with its terms.

5. The contract reads in pertinent part:

Sec. 5. *Labor Protection*—The Public Body agrees to undertake, carry out, and

There remained, however, the original collective bargaining agreement between the Union and the Transit Company which was to run until June 1975. Once the Transit Company was acquired by LaCrosse and became the Municipal Transit Utility, that original agreement would have no effect. In order to cover the period between the acquisition date of January 1, 1975 and the June 1975 expiration date of the original agreement, Local 519 and LaCrosse entered into a "conversion agreement." This agreement set forth the wages, terms, and conditions of employment for the transit employees during the interim period. Notably absent from the conversion agreement was any provision for "interest" arbitration, the arbitration of disputes over the making of subsequent collective bargaining agreements. Once they became public employees, the employees were excluded from coverage by the National Labor Relations Act and instead fell under the provisions of chapter 111 of the Wisconsin Statutes which forbade them to strike.

In June 1975 the conversion agreement expired. When negotiations for a new agreement reached an impasse, Local 519 demanded interest arbitration, invoking the provisions of the 13(c) agreement. LaCrosse disputed the Union's claim, contending that the arbitration of a new collective bargaining agreement should be undertaken pursuant to the conversion agreement. The arbitrators, rejecting LaCrosse's contention, ruled that arbitration of the terms of the new collective bargaining agreement was required by section 11 of the 13(c) agreement. The arbitrators then decided the substantive terms of the dispute between the parties.

The contract established by arbitration in 1975 expired June 16, 1977. Negotiations between the parties over the terms of a new contract began in early 1977, but deadlocked June 18, 1977. On July 8 the Union formally requested the Transit Utility to enter into binding arbitration of a new collective bargaining contract under the terms of the 13(c) agreement. The request was rejected by the Transit Utility. At that point the Union filed this action in the district court, alleging that LaCrosse had violated the 13(c) agreement and the grant contract between LaCrosse and the United States. The complaint requested specific performance.

Shortly after the suit was filed the district court entered a preliminary injunction requiring LaCrosse to proceed to arbitration under section 11 of the 13(c) agreement. Thereafter the defendants filed their motion to dismiss for lack of jurisdiction or to abstain. The motion was denied. At the same time the court stayed the preliminary injunction to permit the defendants to petition this court for a stay. On February 14, 1978 this court denied a stay of the preliminary injunction. By timely notice, the defendants have prosecuted this appeal.

I

A.

The primary question is whether the district court had subject matter jurisdiction under 28 U.S.C. § 1331 to consider this suit. All other questions are subordinate,

---

complete the Project under the terms and conditions determined by the Secretary of Labor to be fair and equitable to protect the interests of employees affected by the Project and meeting the requirements of Section 13(c) of the Act.

These terms and conditions are specified in the letter of certification to the Government from the Department of Labor dated May 1, 1974, which is incorporated herein by reference.

The Municipal Transit Utility of the City of LaCrosse and the Amalgamated Transit Union have executed an agreement, dated April 5, 1974, which provides to members of the Union protections satisfying the requirements of Section 13(c) of the Act.

Accordingly,

a. The agreement, dated April 5, 1974, is made part of the contract of assistance, by reference; and

b. Employees of the LaCrosse Transit Company, other than those represented by unions, and employees of any other urban mass transportation carrier in the service area of the Project are afforded substantially the same levels of protection as are afforded Union members under the April 5, 1974 agreement.

including what remedy, if any, the Union might assert to enforce its alleged right to interest arbitration. The Supreme Court's decision in *Bell v. Hood,* 327 U.S. 678, 682, 66 S.Ct. 773, 776, 90 L.Ed. 939 (1946), requires this approach: "Whether the complaint states a cause of action on which relief could be granted is a question of law and just as issues of fact it must be decided after and not before the court has assumed jurisdiction over the controversy."

The test for determining federal subject matter jurisdiction was correctly enunciated by Judge Doyle in his memorandum opinion, reported at 445 F.Supp. 798, 804 (W.D.Wis.1978):

> A case "arises under" the Constitution or the laws of the United States when its decision depends upon the interpretation of the Constitution or federal law, *Cohens v. Virginia,* 6 Wheat. 264 [19 U.S. 264], 376, 5 L.Ed. 257 (1821); that is, when the action may be defeated by one construction of the law and sustained by the opposite construction. *Osborn v. Bank of the United States,* 9 Wheat. 738, 821–822, 22 U.S. 738, [821–22], 6 L.Ed. 204 (1824); *Gully v. First National Bank,* 299 U.S. 109, 112, 57 S.Ct. 96, 81 L.Ed. 70 (1936); *Goldman v. First Savings and Loan Ass'n of Wilmette,* 518 F.2d 1247, 1251 n. 7 (7th Cir. 1975). For the purpose of federal jurisdiction, an "action" is defined in terms of the right asserted, not the remedy sought. *Cohens v. Virginia, supra* at 379. The right asserted, on which federal jurisdiction depends, must be an essential element of the plaintiff's cause of action. *Gully v. First National Bank, supra; Phillips Petroleum Co. v. Texaco, Inc.,* 415 U.S. 125, 127, 94 S.Ct. 1002, 39 L.Ed.2d 209 (1974).

Mr. Justice Cardozo explicated the test in *Gully v. First National Bank, supra:* "To bring a case within the statute, a right or immunity created by the Constitution or laws of the United States must be an element, and an essential one, of the plaintiff's cause of action. . . . The right or immunity must be such that it will be supported if the Constitution or laws of the United States are given one construction or effect, and defeated if they receive anoth-

er." 299 U.S. at 112, 57 S.Ct. at 97 (citations omitted). Accordingly, we must inquire whether the source of an essential element of the Union's cause of action for breach of contract originates in a law of the United States.

The district court found two such elements in the Urban Mass Transportation Act: (1) a 13(c) agreement was required by § 13(c) of the Act as a condition to La-Crosse's receipt of the grant of public funds and (2) in light of the alleged circumstances, § 13(c) required that the agreement include an interest arbitration provision which was to remain in effect during the life of the capital grant contract. When the totality of the allegations of the complaint are considered, the Union's cause of action contains the necessary elements for federal question jurisdiction irrespective of whether those allegations are bisected according to the analysis undertaken by the district court.

Congress, exercising its spending power, enacted the Urban Mass Transportation Act, which authorized the granting to public bodies, such as a municipality, of federal funds for the acquisition, construction and improvement of mass transportation facilities. As a condition to a grant, the Act requires a contract between the United States and the public body, containing various obligations on the part of the recipient. Specifically, § 13(c) provides that, "It shall be a condition of any assistance . . . that fair and equitable arrangements are made [between the recipient and its employees], as determined by the Secretary of Labor, to protect the interests of employees affected by such assistance." The section then provides that these protective arrangements shall include provisions of the preservation of employee rights under existing collective bargaining agreements, the continuation of such agreements, and the protection of employees against a worsening of their position. Finally, § 13(c) provides that the contract for the grant shall specify the terms and conditions of the protective arrangements.

Because § 13(c) mandates a "fair and equitable arrangement" that meets the approval of the Secretary of Labor, the exact and concrete terms of an arrangement define the more general requirements of the statutory provision. The approval of the Secretary stamps the 13(c) agreement as something more than a mere private contract formulated under the aegis of a federal statute. Instead, the contract is infused with statutory prerequisites. Clearly, then, the terms written into a 13(c) agreement are grounded in federal law. The validity of this view becomes even more clear when we consider that the 13(c) agreement is a part of an overall contract which is itself mandated by the Act. As we have just indicated, the Urban Mass Transportation Act mandates the making of a 13(c) agreement containing exact, fair, and equitable arrangements that have the approval of the Secretary of Labor. But the mandate does not cease when the agreement is reached and approved; perforce it requires the parties to abide by the agreement. Therefore, if enforcement is sought, federal law questions do not "lurk" in the background, as LaCrosse contends; they become the very basis for adjudication. Ineluctably, questions concerning the validity of a contract imposed by the Act and any rights flowing from the contract require application of federal law. The situation here is fundamentally different from that where an order of a federal regulatory agency authorizing the making of a private contract is solely permissive. *McFaddin Express, Inc. v. Adley Corp.*, 346 F.2d 424 (2d Cir. 1965), *cert. denied*, 382 U.S. 1026, 86 S.Ct. 643, 15 L.Ed.2d 539 (1966). In contrast, a 13(c) agreement is so intertwined with the federal statutory scheme that § 1331 subject matter jurisdiction must necessarily arise.

*International Association of Machinists v. Central Airlines, Inc.*, 372 U.S. 682, 83 S.Ct. 956, 10 L.Ed.2d 67 (1963), is direct authority for our holding. In that case a labor union filed a suit in federal court to enforce an award made by an airline board of adjustment. The board had been established by an agreement between the airline company and a labor union pursuant to section 204 of the Railway Labor Act, 45 U.S.C. § 184, which required the creation of the board by private contract. According to the Act the award of the board was final and binding. 45 U.S.C. § 153. The Court held that the action to enforce the award arose under federal law.

As Judge Doyle noted, central to the Court's holding was its observation that the duty to create an adjustment board "was more than a casual suggestion to the air industry." 372 U.S. at 686, 83 S.Ct. at 959. The Court explained:

Although the system boards were expected to be temporary arrangements, we cannot believe that Congress intended an interim period of confusion and chaos or meant to leave the establishment of the Boards to the whim of the parties. Instead, it intended the statutory command to be legally enforceable in the courts and the boards to be organized and operated consistent with the purposes of the Act.

We have held other duties imposed upon the carriers and their employees by the Railway Labor Act binding and their breach redressable in the federal courts, such as the duty to bargain, *Virginian R. Co. v. System Federation*, 300 U.S. 515, 545, 57 S.Ct. 592, 81 L.Ed. 789 and the duty of a certified bargaining representative to represent all members of the craft without discrimination. *Steele v. Louisville & N. R. Co.*, 323 U.S. 192, 65 S.Ct. 226, 89 L.Ed. 173. We take a similar view of the duty to establish adjustment boards under § 204. *Id.* at 690, 83 S.Ct. at 961.

The Court, then, in language peculiarly apposite to the question before us, ruled that a section 204 contract and its enforceability were governed by federal law:

The contracts and the adjustment boards for which they provide are creations of federal law and bound to the statute and its policy. If any provision contained in a § 204 contract is enforceable, it is because of congressional sanction: "[T]he federal statute is the source of the power and authority. . . . The enactment of the federal statute

. . . is the governmental action . . though it takes a private agreement to invoke the federal sanction. . . . A union agreement made pursuant to the Railway Labor Act has, therefore, the imprimatur of the federal law upon it. . . ." *Railway Dept. v. Hanson*, 351 U.S. 225, 232, 76 S.Ct. 714, 718, 100 L.Ed. 1112. That is, the § 204 contract, like the Labor Management Relations Act § 301 contract, is a federal contract and is therefore governed and enforceable by federal law, in the federal courts. *Id.* at 692, 83 S.Ct. at 962.

The Court emphasized the point:

> The contract of the parties here was executed under § 204 and declares a system board award to be final, binding, and conclusive. The claim stated in the complaint is based upon the award and demands that it be enforced. Whether Central must comply with the award or whether, instead, it is impeachable, are questions controlled by federal law and are to be answered with due regard for the statutory scheme and purpose. To the extent that the contract imposes a duty consistent with the Act to comply with the awards, that duty is a federal requirement. If Central must comply, it is because federal law requires its compliance. *Id.* at 695, 83 S.Ct. at 964.

Thus, *Central Airlines* stands for the proposition that an action to enforce a contract mandated by federal statute arises under federal law.

In an attempt to distinguish this case, LaCrosse argues that "the assumption of federal jurisdiction" in *Central Airlines* "was compelled by the manifest need of the subject matter for national decisional uniformity." Brief for Defendant at 18. The argument continues: "Unlike the situation in *Central Airlines* no system of dispute resolution has been prescribed by Congress to govern the parties' relations in this case.

Nor does the Urban Mass Transportation Act contain any suggestion that the 'needs of the subject matter manifestly call for uniformity'. *Id.* at 691–692, 83 S.Ct. 956." Brief for Defendant at 20, 21.

The answer to LaCrosse's argument is that the differences between the Railway Labor Act and the Urban Mass Transportation Act relate to different aspects of employer-employee relations. The former relates primarily to the resolution of labor disputes in the national railroad industry. The latter, although having for its main purpose the grant of public funds for the extension and improvement of urban transportation systems, provides for the protection and preservation of collective bargaining rights of transit employees.[6] Given this difference, both acts, nonetheless, adopt a substantially similar method to obtain their respective objectives: a contract between the parties infused with statutory prerequisites.

As for the needs of the "subject matter uniformity," those needs are identical for the fulfillment of the respective purposes of the two Acts. In *Central Airlines,* the Court expressed it thusly:

> It is therefore the statute and the federal law which must determine whether the contractual arrangements made by the parties are sufficient to discharge the mandate of § 204 and are consistent with the Act and its purposes. It is federal law which would determine whether a § 204 contract is valid and enforceable according to its terms. If these contracts are to serve this function under § 204, their validity, interpretation, and enforceability cannot be left to the laws of the many States, for it would be fatal to the goals of the Act if a contractual provision contrary to the federal command were nevertheless enforced under state law or if a contract were struck down even

---

**6.** Although the Urban Mass Transportation Act's major concern is with the strengthening of mass transportation systems, 49 U.S.C. §§ 1601, 1601a, 1601b, both the legislative history and the Act itself also indicate a definite congressional concern for the economic interests of transit workers affected by the federal grant program. Congress recognized that upon becoming public employees, the workers might well suffer a worsening of their positions. To prevent that deterioration, the Act requires the making of arrangements to safeguard employee rights: a 13(c) agreement.

though in furtherance of the federal scheme. *Central Airlines, supra* at 690–91, 83 S.Ct. at 961–62.

We need only substitute "§ 13(c)" for "§ 204" in the above quotation to illuminate the point.

The holding in *Central Airlines* has been explicitly recognized by this court. *Brotherhood of Railway Clerks v. Special Board of Adjustment No. 605,* 410 F.2d 520 (7th Cir. 1969), *overruled on other grounds, Merchants Dispatch Transportation Corp. v. Systems Federation,* 551 F.2d 144 (7th Cir. 1977). In *Brotherhood of Railway Clerks,* the plaintiff union contended that the federal court possessed §§ 1331 and 1337 jurisdiction to review the award of a Special Board of Adjustment established by contract under a section of the Railway Labor Act which permitted such contractual arrangements for the resolution of grievance-type disputes. We rejected the plaintiff's contention, saying:

> That this case is inapplicable to the dispute before us is apparent if we keep in mind the fact that Board No. 605 is a contractual and not a statutory board. In *Central Airlines,* the parties agreed to establish a system board of adjustment to resolve grievance disputes. The Supreme Court, in ruling that awards of an airline system board of adjustment can be enforced in a federal court, made it clear that agreements to submit matters to these boards were not permissible but mandatory.

410 F.2d at 523. The holding in *Brotherhood of Railway Clerks* was overruled by this court in *Merchants Dispatch.* We continued, however, to recognize the validity of *Central Airlines* as authority for our decision. 551 F.2d at 151–52.

This court's decision in *McDaniel v. University of Chicago,* 512 F.2d 583 (7th Cir. 1975), also supports our present holding. In that case we ruled that federal question jurisdiction existed to enforce the prevailing wage requirements of the Davis-Bacon Act, 40 U.S.C. § 276a–2(b). That statute makes it a condition to the receipt of federal funds that the recipient contract with the federal government to pay laborers the pre-

vailing wage on construction projects. Chief Judge Fairchild wrote:

> We therefore conclude that plaintiff's complaint, in that it sought to enforce defendant's contractual commitment to pay "prevailing" wages as determined by the Secretary of Labor, stated a cause of action under the Davis-Bacon Act for which relief could be granted and that subject matter jurisdiction was properly based upon 28 U.S.C. § 1337.

*Id.* at 588. On remand we expressly adhered to our decision on the jurisdictional question. 548 F.2d 689, at 695.

The Eighth Circuit's decision in *Brotherhood of Locomotive Engineers v. Chicago & North Western RR Co.,* 314 F.2d 424 (8th Cir. 1963), is also pertinent to our holding. As Judge Doyle noted, the analogy of 13(c) of the Urban Mass Transportation Act and § 5(2)(f) of the Interstate Commerce Act, 49 U.S.C. § 5(2)(f), is "obvious." A comparison of the two sections reveals a striking similarity. Apparently Congress patterned § 13(c) after § 5(2)(f). Furthermore, in *Norfolk & Western RR Co. v. Nemitz,* 404 U.S. 37, 92 S.Ct. 185, 30 L.Ed.2d 198 (1971), the Supreme Court implicitly ruled that the exercise of federal court jurisdiction was warranted in enforcing § 5(2)(f) protective agreements.

Lastly, we note that the Eighth Circuit has very recently decided the identical question that is before us, ruling that subject matter jurisdiction under 28 U.S.C. § 1331 is present. *Division 1287, Amalgamated Transit Union v. Kansas City Area Transportation Authority,* 444 F.2d 582, No. 78–1255 (8th Cir., 1978).

B.

■ LaCrosse contends that even if the Union's case is one that "arises under" the laws of the United States it should be dismissed on the grounds that (1) the Union failed to allege in its complaint the requisite amount in controversy in order to confer jurisdiction under 28 U.S.C. § 1331 and (2) the matter in dispute does not exceed the sum of $10,000, exclusive of interest and costs.

The Union failed to plead the jurisdictional fact of the amount in controversy; however, in the absence of a specific allegation, this court may infer the required pecuniary value from the facts stated in the Union's complaint. *Giancana v. Johnson,* 335 F.2d 366 (7th Cir. 1964), *cert. denied,* 379 U.S. 1001, 85 S.Ct. 718, 13 L.Ed.2d 702 (1965).

■ With respect to its second contention, LaCrosse urges that the case be dismissed because the Union is unable to establish in good faith that the matter in controversy exceeds the value of $10,000. The test for determining the minimal amount was stated in *St. Paul Mercury Indemnity Co. v. Red Cab Co.,* 303 U.S. 283, 288–90, 58 S.Ct. 586, 82 L.Ed. 845 (1938). There the Supreme Court ruled: "[I]t must appear to a legal certainty that the claim is really for less than the jurisdictional amount to justify dismissal." Absolute certainty that the requisite amount is satisfied need not be met; a present probability is sufficient. *Scherr v. Volpe,* 336 F.Supp. 882, 885 (W.D.Wis.1971), *aff'd,* 466 F.2d 1027 (7th Cir. 1972). Applying the legal certainty test to a case seeking equitable relief, the jurisdictional amount is to be measured by the value to the complainant of the right which it seeks to protect. *City of Milwaukee v. Saxbe,* 546 F.2d 693, 702 (7th Cir. 1976).

■ The district court resolved the issue of jurisdictional amount by relying on the claims of the Union's members. *See Hunt v. Washington Apple Advertising Comm'n,* 432 U.S. 333, 77 S.Ct. 2434, 53 L.Ed.2d 383 (1977). Accordingly, it determined that the value of a new collective bargaining agreement, at least for some of the individual union members, would exceed $10,000. It was not necessary, however, for the district court to resort to the claims of the individual union members to meet the requisite amount in controversy. The essential object sought to be protected by the Union in this action is the right to an arbitration award when a new contract cannot be reached through bargaining. That right, therefore, is the matter in dispute and its value determines the jurisdictional amount. *See Davenport v. Procter & Gamble Mfg.*

*Co.,* 241 F.2d 511, 514 (1957); 2 J. Moore, *Federal Practice* ¶ 0.92.[5] at 880 (2d ed. 1972). There is no difficulty translating this right into pecuniary terms. The Union is seeking a new collective bargaining agreement for thirty-two employees. It is certain from the facts in the case that a new contract will not be valued at $10,000 or less. It may be readily inferred that past collective bargaining agreements entered into by the Union as representative of these employees involved sums which far exceeded the required jurisdictional amount.

Our determination that the value of the arbitration award of a new collective bargaining agreement may satisfy the $10,000 amount-in-controversy requirement of § 1331 is not an aggregation of the individual claims of the Union members. We agree with the Union that it has an economic interest in a new collective bargaining contract apart from that of the members' interest in the agreement's provisions concerning wages and terms and conditions of employment. *See Smith v. Evening News Ass'n,* 371 U.S. 195, 200, 83 S.Ct. 267, 9 L.Ed.2d 246 (1962); *J. I. Case Co. v. NLRB,* 321 U.S. 332, 64 S.Ct. 576, 83 L.Ed. 762 (1945); *NLRB v. Allis Chalmers Mfg. Co.,* 388 U.S. 175, 87 S.Ct. 2001, 18 L.Ed.2d 1123 (1967). Accordingly, the district court was correct in not dismissing the complaint for insufficiency of the amount in controversy.

C.

■ We turn to the question of whether the Union is entitled to a remedy in federal court. It would seem axiomatic that there is a private right of action to enforce the 13(c) agreement by injunctive relief. By definition a contract is a promise enforceable by law. 1 A. Corbin, *Contracts* § 3 (1963). We agree with Judge Doyle's statement: "Congress intended that the contracts embodying the 'fair and equitable arrangements' were to be enforceable contracts. It would be fatuous to suggest otherwise. Because the contracts were to be enforceable, it follows that they were to be

enforced at the instance of the parties to the contracts." 445 F.Supp. at 811.

Based upon this premise, it follows that since the test for federal question jurisdiction has been met the remedy lies in federal court. The statutory scheme outlined in the Urban Mass Transportation Act and the policy underlying § 13(c) of the Act implies a federal private remedy. Support for this holding is found in *Central Airlines.* There the Court implicitly recognized the existence of a federal private remedy. Also supportive is our statement in *McDaniel II:* "The policy behind the remedy itself, a private suit, is not really in question." 548 F.2d at 694. Because of our holding, an analysis under *Cort v. Ash,* 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975), is unnecessary. That case is inapposite.

## II

Finding jurisdiction, we consider the issue of whether the district court as a matter of equitable discretion should have declined to entertain the suit. We hold that the application of the abstention doctrine is not appropriate in this case.

We begin with the rule that "[t]he doctrine of abstention, under which a District Court may decline to exercise or postpone the exercise of its jurisdiction, is an extraordinary and narrow exception to the duty of a District Court to adjudicate a controversy properly before it. Abdication of the obligation to decide cases can be justified under this doctrine only in the exceptional circumstances where the order to the parties to repair to the State court would clearly serve an important countervailing interest." *County of Allegheny v. Frank Mashuda Co.,* 360 U.S. 185, 188–89, 79 S.Ct. 1060, 1063, 3 L.Ed.2d 1163 (1959), as cited in *Colorado River Water Conservation Dist. v. United States,* 424 U.S. 800, 813, 96 S.Ct. 1236, 49 L.Ed.2d 483 (1976). LaCrosse contends that this case is an exception to the general rule. In particular, it asserts that federal court action would needlessly interfere with the state's administration of its own affairs and disrupt Wisconsin's efforts to establish a coherent policy concerning the relationship between the state and its public employees. *Burford v. Sun Oil Co.,* 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943); *Alabama Public Service Comm'n v. Southern Ry. Co.,* 341 U.S. 341, 71 S.Ct. 762, 95 L.Ed. 1002 (1951); and *Kelly Services, Inc. v. Johnson,* 542 F.2d 31 (7th Cir. 1976).

The present case does not fall within the category of *Burford*-type abstention upon which LaCrosse relies. The Union seeks to enforce a federal right to interest arbitration. There is no complex issue of local law involved in this case which compels the Union to take advantage of Wisconsin's procedural opportunities. Additionally, the fact that the interest arbitration required in this case may conflict with similar rights provided for under the Wisconsin Municipal Employment Relations Law does not, without more, require abstention. *See Colorado River Water Conservation Dist. v. United States, supra* at 816, 96 S.Ct. 1236. We conclude, therefore, that the district court did not abuse its discretion by refusing to abstain from consideration of this case.

## III

The remaining issue, whether the district court abused its discretion by granting a preliminary injunction compelling LaCrosse to proceed to arbitration, may be disposed of summarily.

The standard for the appellate test of a preliminary injunction was set forth by this court in *Scherr v. Volpe,* 466 F.2d 1027, 1030 (7th Cir. 1972):

We start with the observation that our function in reviewing the entry of a preliminary injunction is a limited one. Appellate tribunals may set aside the issuance of such injunctions only where it can be said that the discretion vested in the district court with respect to these matters has been improvidently exercised. . . .

466 F.2d at 1030. Absent a clear abuse of discretion, the district court's process of balancing the probabilities of ultimate success at the final hearing with the consequences of immediate irreparable injury which could possibly result from the denial of preliminary relief will not be disrupted on appeal. *Id.* at 1030.

 We have previously indicated the four prerequisites against which the discretion exercised by the district court must be measured: (1) the plaintiff has at least a reasonable likelihood of success on the merits; (2) the plaintiff has no adequate remedy at law and will be irreparably harmed if the injunction does not issue; (3) the threatened injury to the plaintiff outweighs the threatened harm the injunction may inflict on the defendant; and (4) the granting of the preliminary injunction will not disserve the public interest. *Fox Valley Harvestore v. A. O. Smith Harvestore Prod., Inc.,* 545 F.2d 1096, 1097 (7th Cir. 1976).

The district court found on the basis of the facts before it that the Union had a reasonable likelihood of success on the merits. This criterion is "necessarily a somewhat flexible standard that allows the chancellor room for the exercise of judgment." *Mullis v. Arco Petroleum Corp.,* 502 F.2d 290, 293 (7th Cir. 1974). The factual background of this case is virtually undisputed. As to the legal issues involved, we cannot say that the district court abused its discretion in finding that the Union enjoyed a "good chance" to succeed ultimately in this case.

Turning to the second requirement, the finding of irreparable injury to the Union if LaCrosse did not proceed to compulsory arbitration cannot be considered an abuse of discretion. At the time of the lawsuit, the employees were working without a collective bargaining agreement and negotiations were at an impasse. Similarly, we are convinced that the district court did not abuse its discretion in ruling on the other prerequisites to the issuance of a preliminary injunction.

 Although we believe that an evidentiary hearing would be better practice when district courts are asked to grant interlocutory relief, we do not perceive any procedural defect here. When considering the preliminary injunction, the district court had before it the Union's verified complaint and motion for a preliminary injunction, both of which were accompanied by exhibits. LaCrosse's answer was before the court and both parties filed memoranda concerning the Union's motion. LaCrosse defended on the grounds that the Union waived its rights, but failed to present any evidence on the waiver issue other than the conversion agreement. It chose not to file affidavits contradicting the matters set forth in the affidavit proffered by the Union, despite the instructions of the district court. Accordingly, LaCrosse's contention on appeal that the district court abused its discretion in issuing injunctive relief will not be accepted.

The district court's order granting the preliminary injunction is affirmed.