EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Plaintiff,

v.

LIBERTY TRUCKING COMPANY, and Teamsters Local No. 695, Defendants.

No. 77–C–440.

United States District Court, W. D. Wisconsin.

Dec. 17, 1981.

Kathleen Mulligan, E. E. O. C., Milwaukee, Wis., for plaintiffs.

Gerald Nichol, Madison, Wis., for Liberty Trucking.

Gerry Miller, Goldberg, Previant & Uelman, Milwaukee, Wis., for Teamsters.

---

1. Defendant Liberty Trucking Company is hereinafter referred to as "defendant." Defendant Teamsters Local No. 695 is not referred to in this opinion because it does not figure in

## OPINION AND ORDER

JAMES E. DOYLE, District Judge.

*Preface*

This is a civil action involving alleged discrimination because of religion in which plaintiff seeks: enforcement of a conciliation agreement entered into between defendant Liberty Trucking Company[1] and one of its employees, Delbert Carnahan, with the approval of the Equal Employment Opportunities Commission (hereinafter "EEOC"); an order that defendant make whole any and all persons affected by defendant's violation of the conciliation agreement by restoring Delbert Carnahan to his position at defendant's Madison facility with backpay and interest and all other rights and benefits lost by means of his unlawful discharge; an award of costs to plaintiff; and such further relief as this court deems necessary and proper.

Plaintiff alleges that this court enjoys jurisdiction pursuant to 28 U.S.C. §§ 451, 1337, 1343(4), and 1345 and also 42 U.S.C. § 2000e–5(f)(1), 5(f)(3), and 5(g). Defendant denies that jurisdiction is present. I must address first the jurisdictional issue. Should I find subject matter jurisdiction lacking, I must, on my own motion, dismiss the action. *See* Rule 12(h)(3), Fed.R.Civ.P.

To determine whether the present case meets the jurisdictional tests of the various statutes, I must look solely to the well-pleaded allegations of the amended complaint. *Gully v. First National Bank*, 299 U.S. 109 at 113, 57 S.Ct. 96, 98, 81 L.Ed. 70 (1936); *Louisville & Nashville R. R. v. Mottley*, 211 U.S. 149, 29 S.Ct. 42, 53 L.Ed. 126 (1908) (holding that complaint may not invoke federal jurisdiction by embodying a reply to an anticipated federal defense). There follows below a verbatim recital of plaintiff's statement of the cause of action.

## STATEMENT OF CLAIM

8. More than thirty days prior to the institution of this lawsuit, a person claim-

---

plaintiff's statement of claim; it is named as a defendant pursuant to Rule 12(a) of the Federal Rules of Civil Procedure because it has an interest in the outcome of the action.

ing to be aggrieved filed charges with the Equal Employment Opportunity Commission alleging violations of Title VII [Pub.L. 88–352, Title VII, July 2, 1964, 78 Stat. 253, as amended (hereinafter Title VII)] by the Defendant.

9. Following its investigation of this charge the Commission determined that there was reasonable cause to believe that the Defendant had engaged in conduct which violated Title VII and pursuant to its authority under Section 706(b) of Title VII endeavored to eliminate the allegedly unlawful practices by informal methods of conference and conciliation.

10. As the results of these efforts, the Commission, the Defendant and the aggrieved Charging Party, Delbert Carnahan, entered into and executed a Conciliation Agreement and Memorandum of Agreement which were signed by the Commission May 11, 1977. A copy of this agreement and memorandum is attached hereto as Exhibit A.

11. All conditions precedent to the filing of this action have been fulfilled.

12. Since on or about November 11, 1977, and continuously up to the present time, Defendant Liberty Trucking has intentionally engaged in unlawful employment practices at its Madison facility in violation of the Conciliation Agreement and Memorandum including, but not limited, to the following:

A. Discharge of Delbert Carnahan for exercising his rights as provided in the Conciliation Agreement and Memorandum.

B. Failure or refusal to comply with the reporting provisions of the agreement.

C. Failure or refusal to allow Delbert Carnahan to exercise his vacation rights and to pay attorney fees as set out in the agreement.

D. Failure or refusal to make the necessary contributions on behalf of Delbert Carnahan to the pension fund.

E. Failure or refusal to pay at least 50% of the unpaid balance of the cash settlement and interest on or before the anniversary date of the signing of the Conciliation Agreement (May 11, 1978).

Because the foregoing statement of claim, embodied in the amended complaint, incorporates by reference the agreement referred to as Exhibit A, the terms of that agreement must be considered among the well-pleaded allegations of the complaint for the purpose of testing the presence or absence of jurisdiction. That agreement provides that it "shall become effective as of the date all parties hereto have executed same and the Commission has approved the entire Agreement and shall remain in effect for two (2) years from said date."[2] Its general provisions state: that Carnahan will not sue Liberty about matters which were the subject of the EEOC charges as long as Liberty complies with the agreement; that Liberty's terms and conditions of employment generally (not limited to Carnahan) will not discriminate on the basis of race, color, sex, religion or national origin in violation of Title VII; and that the EEOC will monitor compliance with the terms of the agreement. The agreement's remedial relief provision states that Liberty will make reasonable accommodations to the religious needs of its employees so long as required by Title VII of the Civil Rights Act of 1964. The EEOC guidelines on religious discrimination are explicitly made part of the agreement. The "charging party relief provisions" of the agreement state that Liberty agrees: to reinstate Carnahan to his job with the company, with accrued seniority; to pay him $12,125 for back wages, vacation and holiday pay in install-

2. Very shortly prior to the expiration of the conciliation agreement on May 11, 1979, plaintiff moved for a temporary restraining order extending the life of the conciliation agreement until a decision on the merits is entered in this case. That motion has not been acted upon. I am doubtful that such power resides in the court even when subject matter jurisdiction over the civil action itself is present. However, on the present record it appears that plaintiff alleges, and defendant denies, that defendant has breached the agreement in a manner not mooted by its expiration. Thus the controversy remains live.

ments; to pay Carnahan $2,370 for health and welfare premiums within 20 days of his reinstatement; to pay 100 percent of the contributions to his pension funds which it would have paid had he never been discharged; to make arrangements for him to take 2 and ½ weeks of vacation leave accrued upon the date of his reinstatement; to pay Carnahan's attorney $6,750 within 90 days of the date the agreement became effective; to eliminate from Carnahan's personnel records all entries about the facts and circumstances related to his EEOC charge; to accommodate Carnahan's religious needs by not requiring him to work between ½ hour before sundown Friday and ½ hour after sundown Saturday; and to notify the EEOC of any warnings, reprimands, or discharges of Carnahan. The agreement's reporting provisions state that Liberty agrees: to report to the EEOC about items removed from Carnahan's personnel file and his reinstatement; to send it photocopies of checks and receipts for all moneys disbursed pursuant to the agreement within 10 days of the completion of the payment; and to send a report every six months about the installment payments made to Carnahan.

The conciliation form concludes with a section V entitled "Signatures," which includes a provision: "I have read the foregoing Conciliation Agreement and I accept and agree to the provisions contained therein . . . ." This provision is followed by the signatures of a representative of Liberty, as respondent, and of Carnahan as charging party. There follow an EEOC representative's recommendation of approval of the Conciliation Agreement and a concurrence in that recommendation by her supervisor. Finally, under the words "Approval on behalf of the Commission," there appears the signature of the district director of EEOC.

## OPINION

### I. Ability of EEOC to Sue

■ Before the presence or absence of subject matter jurisdiction in this United States district court is addressed, I inquire briefly whether EEOC is able to bring an action in any judicial forum to obtain enforcement of a conciliation agreement.

H.R.Rep.No.914, 88th Cong., 2d Sess. (1964), *reprinted in* [1964] U.S.Code Cong. & Ad.News 2355, 2404, discloses a version of the original proposed Title VII of the Civil Rights Act of 1964 which includes a provision that:

> . . . the Commission must endeavor to eliminate any such unlawful employment practice by informal methods of conference, conciliation, persuasion and, if appropriate, to obtain from the charged party a written agreement describing particular practices which he agrees to refrain from committing.

But the words "and, if appropriate, to obtain from the charged party a written agreement describing particular practices which he agrees to refrain from committing" were omitted from the Act of July 2, 1964. Pub.L.88–352, tit. VII, 78 Stat. 253 (codified at 42 U.S.C. § 2000e (1970)). As enacted in 1964 and as codified today within 42 U.S.C. § 2000e–5(b), Title VII provides:

> If the Commission determines after such investigation that there is reasonable cause to believe that the charge is true, the Commission shall endeavor to eliminate any such alleged unlawful employment practice by informal methods of conference, conciliation, and persuasion.

In the course of amending Title VII in 1972 so as to empower EEOC to sue employers in certain circumstances, Congress made a further reference to conciliation. It provided that if, within a certain time period, the EEOC "has been unable to secure from the respondent a conciliation agreement acceptable to the Commission," the EEOC may bring a civil action against the respondent-employer. 42 U.S.C. § 2000e–5(f)(1).

Conciliation agreements, such as that involved here, are the outgrowth of these modest statutory seeds. Obviously, Title VII contemplates that in some cases there will be such things as conciliation agreements. But it is unclear from the statute whether EEOC is to be party to such agree-

ments when they occur, as distinct from performing the role of a public agency called upon to find "acceptable" or not to find "acceptable," in terms of the agency's statutory responsibilities, a settlement between the respondent and the charging party or parties. The structure of the particular agreement involved here, and especially the concluding Section V entitled "Signatures," reflects this statutory ambiguity. For the purpose of this opinion, I will assume that under Title VII EEOC may become a party to a conciliation agreement. Taking as true the allegations of the amended complaint, I find that EEOC did become a party to this particular conciliation agreement.

As a party to a contract, EEOC is suing Liberty, another party to the contract, on the contract. Title VII does not expressly authorize EEOC to sue on the contract. The question, then, is whether Title VII implicitly authorizes EEOC to sue on the contract. Subsection 5(f)(1) of 42 U.S.C. provides, as I have noted above, that if within a certain time period, the EEOC "has been unable to secure from the respondent a conciliation agreement acceptable to the Commission, the Commission may bring a civil action against any respondent . . . ." It could hardly be more clear that the authorization to sue embodied in 5(f)(1) does not exist when the Commission has been able to secure such a conciliation agreement. No other provision of Title VII expressly or implicitly authorizes EEOC to sue on the contract. Therefore, only the general body of the law of contracts can serve as the source of EEOC's authorization to sue on this conciliation contract. The general body of the law of contracts does contemplate that parties to contracts may sue one another for appropriate relief when breach of contract occurs. For the purpose of this opinion, I will assume that, like other parties to other contracts, EEOC may sue for relief when it considers that a conciliation agreement has been violated.

The effect of these preliminary holdings and assumptions is to require an answer to whether, as contrasted with some other forum, federal district courts enjoy subject matter jurisdiction in such an action by EEOC to enforce the contract.

### II. Subject Matter Jurisdiction

Since this action was commenced, the jurisdictional amount requirement has been eliminated from 28 U.S.C. § 1331(a). Thus, § 1331(a) is presently a possible jurisdictional footing in addition to the following statutes referred to in the amended complaint: 28 U.S.C. §§ 451, 1337, 1343(a)(4), and 1345, and 42 U.S.C. § 2000e–5(f)(1), (f)(3), and (g). Of these statutes, 28 U.S.C. § 451, 42 U.S.C. § 2000e–5(f)(1), and 42 U.S.C. § 2000e–5(g) do not purport to confer jurisdiction upon the federal district courts, and I disregard them except as one or more may have indirect significance in construing the five remaining statutes.

The most directly relevant of the five is 42 U.S.C. § 2000e–5(f)(3), which provides: "Each United States district court . . . shall have jurisdiction of actions brought under this subchapter [Title VII] . . . ." However, it is convenient to evaluate 28 U.S.C. §§ 1331(a) and 1337 simultaneously with an evaluation of 42 U.S.C. § 2000e–5(f)(3), because the phrases "matter in controversy . . . arises under the . . . laws . . . of the United States . . . ." (§ 1331(a)), "civil action or proceeding arising under any Act of Congress regulating commerce . . . ." (§ 1337), and "actions brought under this [Title VII] . . . ." (§ 2000e–5(f)(3)) must be afforded the same meaning with respect to the jurisdictional question critical in the present case. That "arises under" in § 1331(a) and "arising under" in § 1337 are to be construed identically is supported by *Local Division No. 714, Amalgamated Transit Union, AFL–CIO v. Greater Portland Transit District of Portland, Maine,* 589 F.2d 1 (1st Cir. 1978); *Jersey Central Power & Light Co. v. Local Unions, IBEW,* 508 F.2d 687, 699 n. 34 (3d Cir. 1975), *cert. denied,* 425 U.S. 998, 96 S.Ct. 2215, 48 L.Ed.2d 823 (1976) (no. 75–465, *Jersey Central Power & Light Co. v. Equal Employment Opportunity Commission*), *cert. granted, jdgmt. vacated and case remanded,* 425 U.S. 987, 96 S.Ct. 2196, 48 L.Ed.2d 812

(1976) (No. 75–182, *Equal Employment Opportunity Commission v. Jersey Central Power & Light Co.); Molton, Allen & Williams, Inc. v. Harris*, 436 F.Supp. 853 (D.C. D.C.1977). *See Peyton v. Railway Express Agency, Inc.*, 316 U.S. 350, 62 S.Ct. 1171, 86 L.Ed. 1525 (1942), *reh. denied* 317 U.S. 705, 63 S.Ct. 23, 87 L.Ed. 563 (1942), *reh. denied* 318 U.S. 798, 63 S.Ct. 527, 87 L.Ed. 1162 (1943), *reh. denied* 318 U.S. 799, 63 S.Ct. 658, 87 L.Ed. 1163 (1943), *reh. denied* 318 U.S. 802, 63 S.Ct. 979, 87 L.Ed. 1164 (1942), *reh. denied* 319 U.S. 779, 63 S.Ct. 1024, 87 L.Ed. 1724 (1943). No reason appears why "brought under" in § 2000e–5(f)(3) should be assigned a different meaning.

Therefore, I will address first these three statutory candidates for jurisdictional footing (§§ 2000e–5(f)(3), 1331(a), and 1337); second, § 1331(a) on a separate theory which distinguishes it from § 1337 and § 2000e–5(f)(3) (namely, "federal common law"); third, § 1343; and fourth, § 1345. I will conclude with comments on the decisions of other courts on the specific question of jurisdiction to enforce EEOC conciliation agreements.

### A. Sections 1331(a), 1337, and 2000e–5(f)(3)

In *Local Div. 519, Etc. v. LaCrosse Mun. Transit U.*, 585 F.2d 1340, 1345 (7th Cir. 1978), the court quoted approvingly the following portion of the opinion of this court in that case (445 F.Supp. 798, 804 (W.D.Wis.1978)):

A case "arises under" the Constitution or the laws of the United States when its decision depends upon the interpretation of the Constitution or federal law, *Cohens v. Virginia*, 6 Wheat. 264 [19 U.S. 264], 376, 5 L.Ed. 257 (1821); that is, when the action may be defeated by one construction of the law and sustained by the opposite construction. *Osborn v. Bank of the United States*, 9 Wheat. 738, 821–822, 22 U.S. 738, [821–22], 6 L.Ed. 204 (1824); *Gully v. First National Bank*, 299 U.S. 109, 112, 57 S.Ct. 96, [97] 81 L.Ed. 70 (1936); *Goldman v. First Savings and Loan Ass'n of Wilmette*, 518 F.2d 1247, 1251 n. 7 (7th Cir. 1975). For the purpose

of federal jurisdiction, an "action" is defined in terms of the right asserted, not the remedy sought. *Cohens v. Virginia, supra* [6 Wheat. 19 U.S.], at 379. The right asserted, on which federal jurisdiction depends, must be an essential element of the plaintiff's cause of action. *Gully v. First National Bank, supra; Phillips Petroleum Co. v. Texaco, Inc.*, 415 U.S. 125, 127, 94 S.Ct. 1002 [1003] 39 L.Ed.2d 209 (1974).

The court of appeals continued (585 F.2d at 1345) with the following quotation from *Gully v. First National Bank*, 299 U.S. 109, 112, 57 S.Ct. 96, 97, 81 L.Ed. 70 (1936) (citations omitted):

To bring a case within the statute, a right or immunity created by the Constitution or laws of the United States must be an element, and an essential one, of the plaintiff's cause of action. . . . The right or immunity must be such that it will be supported if the Constitution or laws of the United States are given one construction or effect, and defeated if they receive another.

In the opinion of this court in *Local Div. 519, Etc.*, I observed: "The clarity of these rules is affected by the degree of directness of a particular statutory command. When the right asserted by a plaintiff is embodied in a direct statutory command, application of the rules is simple. When the right asserted by a plaintiff is embodied in a contract which results in turn from a statutory command, application is less simple." 445 F.Supp. at 805.

The right asserted by EEOC in the present case is not a right embodied in Title VII's direct command to Liberty not to discriminate against Carnahan because of his religion. 42 U.S.C. § 2000e–2(a). Because EEOC had been able to secure from Liberty a conciliation agreement acceptable to EEOC, EEOC was foreclosed from bringing an action asserting that right as it is embodied in Title VII's direct command to Liberty. Subject matter jurisdiction cannot be present under § 2000e–5(f)(3) on the theory that this action is "brought [directly] under" Title VII; § 1337, on the theory

that this is an "action . . . arising [directly] under any Act of Congress regulating commerce . . . ."; or § 1331(a), on the theory that the "matter in controversy . . . arises [directly] under" Title VII.

The right asserted by EEOC here is a right embodied in a contract, rather than in a statute. Therefore, plaintiff must be contending that jurisdiction is present under § 2000e–5(f)(3) on the theory that this action is "brought [indirectly] under" Title VII; § 1337, on the theory that this is an "action . . . arising [indirectly] under [an] Act of Congress regulating commerce . . . ."; or § 1331(a), on the theory that the "matter in controversy . . . arises [indirectly] under" Title VII. The plaintiff must be asserting a chain of indirection from (1) statute to (2) contract to (3) the right asserted in the claim set forth in its amended complaint.

It is true that such a chain of indirection may support federal subject matter jurisdiction. But the exact nature of the link between (1) and (2), between statute and contract, is critical. That link must be mandatory.[3] The defendant must have been obliged by the statute to enter into the contract. Moreover, the particular provision must be present in the contract because the statute compels its presence there.

In Local Div. 519, Etc., the complaint alleged with sufficient clarity, and not frivolously, that the Urban Mass Transportation Act of 1964, 49 U.S.C. § 1601 et seq., commanded, as a condition to the receipt of federal funds for the city's public transportation program, that the city enter into a certain type of contract with a union and also that the required contract embody a certain provision for so-called "interest arbitration." The right asserted by the union in the lawsuit was the right to compel the city to engage in interest arbitration. Therefore, it was held that the assertion of this right by the union created a matter in controversy arising under a law of the United States (the Urban Mass Transportation Act), within the meaning of § 1331(a).

The complaint by EEOC in the present case does not allege that Title VII required Liberty Trucking to enter into the contract and that Title VII required that the contract include the very provisions which Liberty is alleged to have breached. Thus, this case differs sharply from Local Div. 519, Etc. and the authorities upon which this court and the court of appeals there relied to establish jurisdiction under § 1331(a). Although the failure to allege in its complaint that Title VII compelled Liberty Trucking to enter into the contract probably prevents EEOC from asserting such a proposition by brief and argument, and although it is not at all clear that EEOC has advanced that proposition even by brief and argument, I will address it.

In part I of this opinion, I examined the language and some history of Title VII in the course of inquiring whether the statute authorizes EEOC to become a party to conciliation agreements and, if so, whether it authorizes EEOC to bring suit for breach of a conciliation agreement to which it is a party. That discussion bears as well on the question whether, in any circumstance, Title VII either directly compels an employer to enter into a conciliation agreement or empowers EEOC to compel an employer to do so. Even as Congress added significantly to EEOC's powers in 1972 by authorizing it to sue respondents directly for violations of Title VII, Congress did so only when EEOC is unable to secure from respondents conciliation agreements acceptable to EEOC, thus clearly recognizing that respondents are not obliged to enter into such agreements. 42 U.S.C. § 2000e–5(f)(1). To equate EEOC's obligation to engage in the informal methods of conference, conciliation, and persuasion, with a statutory power to compel an employer to enter into a conciliation agreement would be tantamount to construing EEOC's power to find reasonable cause as a power to find a violation of Title VII and to compel compliance with the Act. In amending Title VII in 1972, Congress rejected the proposal that EEOC be

---

**3.** In Part II B of this opinion I will address a qualification to this proposition. *See Mer-*

*chants Despatch Transp. v. Systems Fed., Etc.,* 551 F.2d 144 (7th Cir. 1977).

given the analogous power to find violations of Title VII and to issue cease and desist orders. *See* H.R.Rep.No.238, 92d Cong., 2d Sess. (1972), *reprinted in* [1972] U.S.Code Cong. & Ad.News 2137, 2162. From the language of Title VII and its history, I conclude that Title VII does not explicitly or implicitly compel employers, under any circumstance, to enter into conciliation agreements. The chain of indirection from (1) Title VII to (2) conciliation agreement is insufficient to support jurisdiction under § 2000e–5(f)(3).

Because Title VII fails to provide the necessary ingredient of compulsion and because no other act of Congress is pointed to, as the source of compulsion upon Liberty to enter into the conciliation agreement, the chain of indirection is insufficient as well to support jurisdiction under § 1337 and § 1331(a).[4]

### B. *Section 1331(a) and Federal Common Law*

■ The pertinent language of § 1331(a) is: "... the matter in controversy ... arises under the Constitution, laws, or treaties of the United States ...." There is no suggestion that the matter in controversy here arises under the Constitution or treaties. In part II A of this opinion, I have discussed "laws" in terms of statutes: either a right embodied in a direct statutory command or embodied in a contract which has resulted in turn from a statutory command. It must be considered, as an alternative, whether the matter in controversy here arises under nonstatutory "laws" of the United States, namely, federal judicial decisions, sometimes spoken of as "federal common law." The rules embodied in federal common law are "laws" of the United States for purposes of § 1331(a). *Illinois v. City of Milwaukee*, 406 U.S. 91, 98–101, 92 S.Ct. 1385, 1390–91, 31 L.Ed.2d 712 (1972).

Plaintiff cites no existing body of federal common law concerning the construction and enforcement of EEOC conciliation agreements, and I am aware of none.

Rather it is a question whether there is urgent need to develop such a body of federal common law and to develop it through the federal courts.

It was open to Congress to apprehend the destructive force of discrimination in employment because of workers' race, color, religion, sex, or national origin, and to respond by declaring such discrimination contrary to national policy and unlawful. Congress did so. 42 U.S.C. § 2000e–2(a)(1). It was open to Congress to create a national administrative agency to implement this declaration. Congress did so. 42 U.S.C. § 2000e–4. But Congress limited its expenditure of national power in giving effect to national policy. An effort was made to provide state and local government with the first opportunity to address particular instances of alleged discrimination in employment. 42 U.S.C. §§ 2000e–5(b), (c), (d), and (e), 2000e–7, and 2000e–8(b) and (d). Also, within the limits of the power of the national government which Congress did commit, the portion to be exercised by the national administrative agency was limited. 42 U.S.C. §§ 2000e–4 and 2000e–5(b) and (f). *See E. E. O. C. v. Sears, Roebuck & Co.,* 504 F.Supp. 241, 253–254 (N.D.Ill.1980). Although the ultimate coercive power is lodged in the national courts, *Batiste v. Furnco Construction Corporation,* 503 F.2d 447, 449–451 (7th Cir. 1974), *cert. denied* 420 U.S. 928, 95 S.Ct. 1127, 43 L.Ed.2d 399 (1975), Title VII is a deployment of a mix of persuasion and coercion and a mix of administrative and judicial responses, at local, state, and national levels. The allocation of ultimate coercive power to the national courts reflects a judgment that when informal methods of conference, conciliation and persuasion fail and charging parties or the EEOC resort to the courts to vindicate rights embodied in Title VII itself, the substance of those Congressionally granted rights should be authoritatively formed and defined within a unified court system at the national level. The question is how the

4. In part II(B) of this opinion, I address the possibility that nonstatutory "law" may support jurisdiction under § 1331(a).

function of EEOC-inspired conciliation agreements is to be viewed against this backdrop of the ultimate exercise of coercive judicial power.

As contracts, conciliation agreements have their genesis in state law. *Cf. Gully, supra,* 299 U.S. at 114, 57 S.Ct. 98; *Pan Am. Corp. v. Superior Court,* 366 U.S. 656, 663, 81 S.Ct. 1303, 1307, 6 L.Ed.2d 584 (1961); *Skelly Oil Co. v. Phillips Co.,* 339 U.S. 667, 672, 70 S.Ct. 876, 879, 94 L.Ed. 1194 (1950). The presumption is that state contract law would govern their construction and enforcement. In *Wallis v. Pan American Pet. Corp.,* 384 U.S. 63, 68, 86 S.Ct. 1301, 1304, 16 L.Ed.2d 369 (1966), it was said:

> In deciding whether rules of federal common law should be fashioned, normally the guiding principle is that a significant conflict between some federal policy or interest and the use of state law in the premises must first be specifically shown. It is by no means enough that, as we may assume, Congress could under the Constitution readily enact a complete code of law governing transactions in federal mineral leases among private parties. Whether latent federal power should be exercised to displace state law is primarily a decision for Congress. Even where there is related federal legislation in an area, as is true in this instance, it must be remembered that "Congress acts . . . against the background of the total *corpus juris* of the states . . . ." Hart & Wechsler, *The Federal Courts and the Federal System* 435 (1953).

And in *American Invs-Co Countryside v. Riverdale Bank,* 596 F.2d 211, 218 (7th Cir. 1979), it was added:

> General assertions of the need for a uniform body of governing law are insufficient, particularly when there is no indication that application of the laws of the various states would result in varying or inconsistent rights and duties for the federal government.

One view might be that the conciliation agreements contemplated by Congress would tend to be informal, specific, practical, prompt forms of resolution of employer-employee misunderstandings and difficulties in a manner satisfactory to the disputants themselves. Title VII's heavy emphasis on initial resort to the informal methods of conference, conciliation, and persuasion strongly supports this view. Agreements emerging from these informal methods might be expected to embody concrete remedies for past violations involving specifically identified workers, rather than more elaborate, general, and prospective commitments as to future conduct. For example, in the conciliation agreement involved here Liberty agreed to pay Carnahan certain sums of money by certain dates. There is little reason to suppose that such a promise would be construed differently by one state court than by another, or differently by state courts generally than by federal courts generally. No potential for significant conflict with some federal policy or interest seems to lurk in state court application of contract law to such a provision.

The most serious potential for conflict with some federal policy or interest arises from wholesale incorporation of Title VII into the conciliation agreement, coupled with a prospective commitment by the respondent to honor those statutory requirements. This is illustrated by the inclusion in the conciliation agreement in the present case of: (1) a commitment by respondent Liberty that its practices with respect to all of its employees, not only Carnahan, will comply with Title VII's prohibition against discrimination because of race, color, sex, or national origin, not only religion; and (2) a somewhat repetitive commitment, also encompassing all of respondent's employees, with respect to religious discrimination particularly, including incorporation of the EEOC guidelines on that subject. If, during the term of the contract, EEOC were to come to believe that Liberty was discriminating against an employee other than Carnahan on grounds other than religion, and EEOC then sought injunctive relief on the basis of the contract provision forbidding discrimination against any employee on any ground mentioned in Title VII, the court in which EEOC sued would be called upon to

construe the statute. If the court were a state court, its construction of the statute would be unreviewable by any national court other than the Supreme Court of the United States, in the unlikely event that the Supreme Court might choose to exercise its power to review.

I appreciate that when respondents are amenable to conciliation, EEOC is probably disposed to make the most of these opportunities to effectuate the purposes of Title VII, and that as a condition to granting its approval, it probably presses for inclusion of provisions ranging well beyond the precise dispute at hand, looking to the future as well as the past. I imply no criticism of this expansiveness and surely I imply no opinion as to its legality. But if engaged in successfully by EEOC on a grand scale, the result would be that EEOC would enjoy two broad avenues to judicial enforcement of Title VII itself: (1) the avenue provided for in 42 U.S.C. § 2000e–5(f)(1), namely, suits alleging that respondents have violated the provisions of Title VII itself; and (2) an avenue not provided for in 42 U.S.C. § 2000e–5(f)(1), namely, suits alleging that respondents have violated the provisions of contracts into which Title VII has been incorporated wholesale. I do not believe that, assuming its validity, such improvisation should be thought to create the necessity for federal courts alone to develop a federal common law governing the enforcement and construction of conciliation agreements.

Even if such improvisation by EEOC is entitled to recognition as a factor in deciding whether the exercise of federal district court jurisdiction is necessary to develop and apply a body of federal common law relating to the enforcement and construction of EEOC conciliation agreements, two major factors diminish its force.

The first is that there is already in place a coherent body of federal court construction of Title VII itself. When charging parties and the EEOC have sued in federal district courts, alleging violations of Title VII itself, they have already generated a considerable body of federal law construing the statute. As these suits continue to be brought and adjudicated, that body of federal law is certain to continue to develop. It is a body of law readily available to state courts when they are confronted with the wholesale incorporation of the language of Title VII within conciliation agreements. There is no reason to suppose that state courts would be disposed to ignore or to reject this body of federal law.[5]

The second factor is that the national government need not be subjected more than briefly to an unwelcome construction which the courts of a particular state may choose to place upon the language of Title VII as incorporated by reference in EEOC conciliation agreements. This is because the national government's involvement in conciliation agreements arises solely from the exercise by EEOC of its power to find such agreements acceptable or not to find them acceptable. Thus, in a state whose courts may place an unwelcome construction upon Title VII, when Title VII language is simply incorporated wholesale into conciliation agreements, EEOC has only to withhold approval on subsequent occasions unless the conciliation agreement embodies precise language to its liking.

Before an overall conclusion is drawn from the preceding analysis, it is necessary to consider the possible bearing of *Merchants Despatch Transp. v. Systems Fed. Etc.*, 551 F.2d 144 (7th Cir.1977), which dealt with the scheme for regulation of labor-management relations in the nation's railway network, embodied in the Railway Labor Act, 45 U.S.C. §§ 151–163. The his-

---

5. In an analogous setting, most courts which have reached the question have held that when a state statute incorporates by reference a provision of an Act of Congress, a controversy arising under that particular provision of the state statute does not arise under a law of the United States, for the purpose of conferring subject matter jurisdiction upon federal district courts. *See* 13 Wright, Miller, and Cooper, *Federal Practice and Procedure* (1975 & Supp. 1980) § 3563, n. 15, and cases there cited. The effect of these holdings is to forego, in some measure, federal court control of all judicial construction of language used by Congress.

tory of that Act is treated at length in *International Ass'n of Machinists, AFL-CIO v. Central Airlines, Inc.*, 372 U.S. 682, 83 S.Ct. 956, 10 L.Ed.2d 67 (1963), *reh. denied* 373 U.S. 947, 83 S.Ct. 1533, 10 L.Ed.2d 702 (1963), and *Merchants Despatch Transp.*, 551 F.2d at 146–151. In *Merchants Despatch Transp.*, an employer-carrier filed suit in a federal district court, seeking a review of an award granted to an employees' union by an arbitrator, namely, a "special board of adjustments." The district court dismissed the suit, holding that it lacked jurisdiction to review arbitration awards by special boards of adjustments, 413 F.Supp. 577 (N.D.Ill.1976), and the plaintiff-employer appealed. The court of appeals reversed the judgment of the district court, holding that 28 U.S.C. §§ 1331 and 1337 conferred jurisdiction upon the federal district courts.

The overriding purpose of the Railway Labor Act has been to avoid any interruption in the rail service which is so vital to the nation. 45 U.S.C. § 151a(1). A corollary purpose, essential to realization of that overriding purpose, has been to provide for the prompt and orderly settlement of all labor-management disputes. § 151a(4) and (5). A statutory duty is placed upon both employers and employees "to exert every reasonable effort to make and maintain agreements concerning rates of pay, rules, and working conditions, and to settle all disputes . . . ." § 152 First. If disputes are not resolved by less formal means, they must be submitted to a National Railroad Adjustment Board (NRAB), as an arbitrator, whose decision is final and binding. Employers or employees can obtain from federal district courts a review of NRAB awards. § 153. However, one alternative open to either employers or employees is to require the establishment of a so-called "public law board" for binding arbitration, rather than by NRAB, and the awards of the public law boards may also be reviewed by federal district courts. § 153 Second, second paragraph.

The remaining alternative open to employers and employees is to agree to create "special boards of adjustment" for binding arbitration, rather than by NRAB or public law boards. § 153 Second, first paragraph. *Merchants Despatch Transp.* addressed the question whether federal district courts enjoy jurisdiction to review the awards of these special boards of adjustment. The court of appeals decided that although the Railway Labor Act provides for such federal district court review of awards by NRAB and by public law boards, the Railway Labor Act does not provide for such review of the awards of special boards of adjustment. 551 F.2d at 148–151. The question was whether disputes over the awards of special boards of adjustment "arise under" the Railway Labor Act, so as to create jurisdiction under 28 U.S.C. §§ 1331(a) or 1337. The court of appeals answered that question affirmatively.

It is to be noted that in *Merchants Despatch Transp.*, the Railway Labor Act did compel the parties to enter into a collective bargaining agreement, as did the Urban Mass Transportation Act in *Local Div. 519, Etc. v. LaCrosse Mun. Transit U.*, 585 F.2d 1340, but that the Railway Labor Act did not compel the parties to include in their agreement a provision for arbitration by a special board of adjustment, as the Urban Mass Transportation Act required the parties to include in their agreement a provision for "interest arbitration." However, in *Merchants Despatch Transp.*, the plaintiff was not seeking in federal district court to compel the defendant to comply with the contract by going to arbitration before a special board of adjustment, as the plaintiff in *Local Div. 519, Etc.* had been seeking to compel the defendant to comply with the contract by going to interest arbitration. In *Merchants Despatch Transp.*, rather, the parties to the collective bargaining agreement had agreed to go to arbitration by a special board of adjustment, and they had fulfilled that agreement by going to such arbitration. It was enforcement of the resulting arbitration award which plaintiff in *Merchants Despatch Transp.* desired the federal district court to prevent. Thus, in *Merchants Despatch Transp.*, neither the plaintiff's jurisdictional contention nor the holding by the court of appeals embodied

the "chain of indirection" theory—from (a) statute to (2) contract to (3) claim stated in the court complaint—discussed in part II A of this opinion.

The jurisdictional theory embraced by the court of appeals in *Merchants Despatch Transp.* more nearly approaches, but does not coincide with, the "federal common law theory." The court of appeals was persuaded that although the Railway Labor Act did not authorize federal district courts to review the arbitration awards of special boards of adjustment, too severe a danger existed that the overriding purpose of the Railway Labor Act might be frustrated in some degree if it were left to state courts alone to review the arbitration awards of special boards of adjustment. 551 F.2d at 151–152. The Railway Labor Act flatly requires arbitration: if not by NRAB, and if not by a public law board, then by a special board of adjustment. It was within the power of the parties to select the instrument of arbitration but not to refrain from arbitration. And it is the Railway Labor Act itself which gives binding effect, not to the contract, but to the arbitration award. The justification for this unusual compulsion upon private parties—to submit their disputes to arbitration and to be bound by the award—lies in the Congressional finding that avoidance of interruption of rail service is an exigent need of the national community. Under these circumstances, the court of appeals decided that it was the federal courts who must be entrusted with supplying the ultimate judicial coercion to abide by the arbitration award. It was in this sense that when the employer challenged the arbitration award, the matter in controversy arose under the Railway Labor Act, within the meaning of §§ 1331(a) and 1337.

By contrast, an employer is not required by Title VII even to exert an effort to negotiate a conciliation agreement. When a conciliation agreement is entered into, neither party is required by Title VII to submit ensuing disputes to arbitration, and, if they should decide to do so, to submit to the ensuing award. It is not the authority of an arbitration award which is implicated in the present case, but the enforcement of a contract.

It would be pointless to speculate whether Congress regards the need to eradicate discrimination in employment as more or less profound than the problem of avoiding interruptions in the operations of the national railway system. What is relevant here is that Congress provided for differing methods of resolution of disputes arising in the two areas. With respect to discrimination in employment, the method provided for is the commencement of a court action when less formal methods fail. If discrimination is found to have occurred, devices such as reinstatement and back pay are relied upon as remedies after the fact. With respect to the operations of the national railway system, Congress undertook to anticipate and to avoid the targeted evil, namely, "*any* interruption to commerce or to the operation of *any* carrier engaged therein ...." 45 U.S.C. § 151a(1) (emphasis added). It undertook to accomplish this by imposing on railway labor and management an omnipresent, affirmative duty to negotiate collective bargaining agreements and to resolve disputes through binding arbitration.

In light of Title VII's deference to local and state authority, its emphasis upon informal methods of conference, conciliation, and persuasion, and the limited nature of authority conferred upon EEOC, there is no necessity that questions of enforcement and construction of conciliation agreements be assigned to federal district courts. There is neither an existing body of federal common law on the subject of conciliation agreements, nor an embryo of such federal common law in urgent need of development, which can be considered a "law" of the United States under which the matter here in controversy arises, within the meaning of 28 U.S.C. § 1331(a).

### C. *Section 1343(a)(4)*

■ Title 28, U.S.C. § 1343(a)(4) provides: "The district courts shall have original jurisdiction of any civil action authorized by law to be commenced by any person:

... (4) To recover damages or to secure equitable or other relief under any Act of Congress providing for the protection of civil rights, including the right to vote."

The first question is whether this action is "authorized by law." In part I, above, I have held that it is not authorized by Title VII or by any other act of Congress, but that, assuming Title VII authorizes EEOC to be a party to conciliation contracts, this action is authorized by the general body of the law of contracts, contemplating that parties to contracts may sue one another for their alleged breach. It is doubtful that an action authorized only in this sense is "authorized" within the meaning of § 1343(a).

In any event, a second question is whether the action has been "commenced ... under any Act of Congress providing for the protection of civil rights ...." I will assume that Title VII is an act of Congress providing for the protection of civil rights, as contrasted with an exercise of Congressional power under the commerce clause. But for reasons set forth at length in II A, above, I hold that this action has not been "commenced under" Title VII or "under" any other act of Congress.

### D. Section 1345

Title 28, U.S.C. § 1345 provides:

Except as otherwise provided by Act of Congress, the district courts shall have original jurisdiction of all civil actions, suits or proceedings commenced by the United States, or by any agency or officer thereof expressly authorized to sue by Act of Congress.

Section 1345 restricts federal court jurisdiction of suits by agencies of the United States to "those instances in which the power to sue is specifically placed" in the hands of agencies, rather than in the hands of the Attorney General. 1 *Moore's Federal Practice* ¶ 0.65 [1.–1], at 700.83 (2d ed.1981). EEOC is among the agencies which is expressly authorized by Congress to bring suit, § 2000e–5(f)(1); but not this suit. As Moore observes, *id.* at 700.84, and as discussed earlier in this opinion, the express authorization embodied in 5(f)(1) is opera-

tive only after efforts at conciliation have failed.

### E. Decisions of Other Courts

In *Brito v. Zia Company*, 478 F.2d 1200 (10th Cir.1973), the action was brought by individual employees, not by EEOC, and it appears principally to have been brought directly on Title VII, but nominal damages were awarded one individual plaintiff for breach of a conciliation agreement. Jurisdiction to enter such an award was assumed, without discussion.

In *Equal Employment Opportunity Commission v. Mississippi Baptist Hospital*, 11 EPD ¶ 10,822, p. 7447, 12 FEP Cases 411 (S.D.Miss.1976), in an action by EEOC to enforce a conciliation agreement, the court decided that it enjoyed jurisdiction under § 2000e–5(f)(3), and proceeded to exercise it. Because conciliation agreements are an integral part of Title VII, the court said, those agreements "would be meaningless if the Courts empowered to hear other Title VII actions could not hear actions to enforce conciliation agreements." *Id.* at 7448, 12 FEP Cases at 412. The court continued by stating that even if § 2000e–5(f)(3) does not confer jurisdiction, both 28 U.S.C. § 1337 and 28 U.S.C. § 1343(4) do, citing in support of the latter proposition *Jersey Central Pwr. & Light Co. v. I.B.E.W. Local 327, et al.*, 508 F.2d 687. I have explained my view that conciliation agreements would not be rendered meaningless if suits to enforce them were to be heard by state courts, and also my view that §§ 1337 and 1343(4) do not afford jurisdiction.

In *E.E.O.C. v. St. Louis Labor Health Institute*, 16 EPD ¶ 8271, p. 5399, 17 FEP 250, 251 (E.D.Mo.1978), in an action by EEOC to enforce a conciliation agreement, the court stated: "Jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 451, 1337, 1343(3) (1970), 1343(4), 1345 and 42 U.S.C. § 2000e–5(f)(3). *E.E.O.C. v. Mississippi Baptist Hospital*, [11 EPD ¶ 10,822] 12 FEP Cases 411 (S.D.Miss.1976)." With no further discussion, the court proceeded to exercise jurisdiction. Title 28 U.S.C. § 1343(3) (1970) grants jurisdiction of civil

actions authorized by law by any person to redress the deprivation, "under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by" the Constitution or certain statutes of the United States. There is no allegation in the present case that Liberty was acting under color of any state law, statute, ordinance, regulation, custom or usage.

In *E.E.O.C. v. Contour Chair Lounge Co., Inc.*, 457 F.Supp. 393, 394 (E.D.Mo.1978), *aff'd in part, rev'd in part on other grounds, remanded with directions*, 596 F.2d 809 (8th Cir.1979), in an action by EEOC to enforce a conciliation agreement, the court stated: "This Court has jurisdiction over the subject matter and, the parties to this suit in accordance with 42 U.S.C. § 2000e *et seq.*" On the appeal, a major question was the validity of certain affirmative action provisions embodied in the conciliation agreement. The employer contended that such provisions would have been valid only if it had been guilty of racial discrimination at some earlier time. The district court had decided, and the court of appeals agreed, that affirmative action requirements were permissible. It was in this context that both the district court and court of appeals held that such affirmative action requirements were as effective in a conciliation agreement as they would have been in a judgment by a district court entered in an action brought directly on Title VII. Thus, both the district court and the court of appeals actually engaged in the exercise of jurisdiction over the merits of the case. However, there was no discussion of the jurisdictional basis for federal district court enforcement of the conciliation agreement, with or without affirmative action requirements.

In *Jersey Cen. Pow. & Li. Co. v. Local Un. 327, Etc. of I.B.E.W.*, 508 F.2d 687 (3d Cir.1975), an employer commenced an action in a federal district court for a declaratory judgment concerning its obligations in the course of reducing its work force. The employer alleged that conflicting provisions on this subject appeared in its collective bargaining agreement with its unions, on the one hand, and, on the other, a conciliation agreement among the employer, its unions, and EEOC. Named as defendants were the unions, EEOC, the United States Office of Federal Contract Compliance (OFCC), the United States General Services Administration (GSA), and the New Jersey Division of Civil Rights. The district court denied motions by OFCC and GSA to dismiss for lack of subject matter jurisdiction; EEOC did not challenge jurisdiction. The district court exercised its jurisdiction by granting a motion for partial summary judgment, and it authorized an interlocutory appeal, which the court of appeals accepted. The court of appeals engaged in fresh inquiry whether jurisdiction in the federal courts was present and decided that it was present. *Id.* at 698–699. It held that the complaint correctly predicated jurisdiction on the Labor Management Relations Act of 1947, 29 U.S.C. § 185(a). The court continued (*id.* at 699):

> We also believe that jurisdiction has been properly invoked with respect to those issues involving the conciliation agreement and the EEOC. In our opinion, inasmuch as the EEOC agreement must be interpreted according to federal substantive law, *see United States v. Seckinger*, 397 U.S. 203, 209–210, 90 S.Ct. 880, [884–85] 25 L.Ed.2d 224 (1970), the Company's cause of action joining EEOC "arises under" laws of the United States within the meaning of 28 U.S.C. § 1331. [Footnote omitted]. *See Illinois v. City of Milwaukee*, 406 U.S. 91, 100, 92 S.Ct. 1385, [1391] 31 L.Ed.2d 712 (1972); *Ivy Broadcasting Co. v. American Tel. & Tel. Co.*, 391 F.2d 486, 492 (2d Cir.1968).

The court continued with the statement: "even if there were no independent ground of jurisdiction existing under § 1331, . . . there exists jurisdiction ancillary to the proper resolution of the Company's cause of action based upon the collective bargaining agreement." *Id.* To this latter comment, the court appended a footnote (n. 34), to the effect that because it had held jurisdiction to be present on the grounds just described, it was unnecessary to consider whether 28 U.S.C. § 1337 also afforded jurisdiction.

With respect, I suggest that the uncertainty revealed by the court of appeals in *Jersey Cen. Pow. & Li. Co.* ("even if there were no independent ground of jurisdiction existing under § 1331 . . . .") was warranted. *United States v. Seckinger*, 397 U.S. 203, 90 S.Ct. 880, 25 L.Ed.2d 224 (1970), *reh. denied* 397 U.S. 1031, 90 S.Ct. 1255, 25 L.Ed.2d 546 (1970), cited in *Jersey Cen. Pow. & Li. Co.* in support of the proposition that the EEOC conciliation agreement must be interpreted according to federal substantive law, involved a contract between the United States and a plumbing contractor for certain plumbing work to be done at a United States Marine base. The *Seckinger* court referred to the extensive statutory provisions for the procurement, management, and disposal of government property, and Congressional authorization to the Administration of General Services to issue regulations necessary to the performance of his or her managerial services. *See generally* 40 U.S.C. §§ 471–535. In *Seckinger*, in support of its conclusion that federal law controlled the interpretation of the plumbing contract, the Court cited *United States v. County of Allegheny*, 322 U.S. 174, 183, 64 S.Ct. 908, 913–14, 88 L.Ed. 1209 (1944) (involving a question of the taxing powers of a county with respect to machinery located within a manufacturing plant under a 1940 contract between the United States and the manufacturer for the production of large field guns for the War Department), and *Clearfield Trust Co. v. United States*, 318 U.S. 363, 63 S.Ct. 573, 87 L.Ed. 838 (1943) (involving the rights and duties of the United States on commercial paper which it issues, specifically, a check drawn on the Treasurer of the United States to an individual in payment for services rendered to the Works Progress Administration). The contracts in *Seckinger, County of Allegheny*, and *Clearfield Trust Co.* were all executed by the United States in the mainstream of its proprietary functions under the Constitution. They are a far cry from an agreement negotiated under stimulation from an agency of the United States, for the purpose of resolving a controversy between an employer and an employee. In the latter circumstances, EEOC is free to find the conciliation agreement acceptable or to find it unacceptable. If EEOC finds it unacceptable, EEOC remains free to seek enforcement of the statute in the federal courts. In cases of plumbing construction on a Marine base, manufacture of large field guns for the War Department and payment for services rendered to the government, the essential and continuing proprietary functions of government are implicated. The need for uniform judicial construction of those contractual instruments is far more urgent than is true in the case of conciliation agreements.

In none of the cases cited by plaintiff, nor in any of the others to which I have referred, has a court examined closely the footing for federal district court jurisdiction in an action brought by EEOC to enforce a conciliation agreement. Those in which jurisdiction has been exercised are not persuasive.

### ORDER

It is ordered, on the court's motion, that this action is dismissed for lack of subject matter jurisdiction.